[No. G034988. Fourth Dist., Div. Three. Mar. 30, 2006.]

THE PEOPLE, Plaintiff and Respondent, v.
ABIMAEL FLORES NAJERA, Defendant and Appellant.

**COUNSEL**

Paul R. Ward, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, David Delgado-Rucci and Jennifer Jadovitz, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**FYBEL, J.—**

### INTRODUCTION

Defendant Abimael Flores Najera was charged with the first degree murder of Victor Hernandez. The jury convicted Najera of second degree murder, and the trial court sentenced him to an indeterminate term of 15 years to life. Najera contends the conviction for second degree murder should be reduced to voluntary manslaughter (Pen. Code, § 192, subd. (a)) on several grounds. Most significantly, he contends the prosecutor committed misconduct by misstating the law of murder and voluntary manslaughter during closing

argument and rebuttal. Najera contends his trial counsel was ineffective by failing to object to the misconduct and to request admonitions.

We agree the prosecutor committed misconduct by making incorrect statements about the law of murder and voluntary manslaughter. Although Najera's trial counsel failed to object to the misconduct, Najera did not receive ineffective assistance of counsel because Najera was not entitled to a manslaughter instruction. Voluntary manslaughter is the unlawful killing of a person without malice "upon a sudden quarrel or heat of passion." (Pen. Code, § 192, subd. (a).) The sudden quarrel or heat of passion must be provoked by the victim's conduct or by conduct that the defendant reasonably believed was engaged in by the victim.

The provocative conduct Najera claims gave rise to a sudden quarrel or heat of passion was that Hernandez called Najera a "jota," translated at trial to mean "faggot." We hold calling Najera that name was insufficient to cause an average person to lose reason and judgment under an objective standard; therefore, Najera was not entitled to a voluntary manslaughter instruction.

Since we conclude Najera was not entitled to a voluntary manslaughter instruction, we do not reach his contentions that CALJIC No. 8.42, explaining sudden quarrel or heat of passion, is ambiguous and that the trial court did not sufficiently respond to a jury question by referring the jury to that instruction. In addition, we reject Najera's arguments that (1) the trial court committed prejudicial error by excluding evidence of a statement Najera made during a police investigation; (2) the sequence of the jury instructions permitted the jury to convict Najera of murder before deciding whether the killing was on a sudden quarrel or heat of passion; and (3) errors were cumulative. We therefore affirm.

## FACTS

We view the evidence in the light most favorable to the verdict and resolve all conflicts in its favor. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206 [26 Cal.Rptr.2d 23, 864 P.2d 103]; *People v. Barnes* (1986) 42 Cal.3d 284, 303 [228 Cal.Rptr. 228, 721 P.2d 110].)

During the late afternoon of August 28, 2003, Najera and Victor Hernandez were sitting, drinking beer, and talking in the front yard of a house on South Golden West in Santa Ana where they rented rooms. Hernandez's uncle, Javier Penaloza, also was in the yard talking, and Najera's brother, Elias Najera, walked back and forth between the yard and the house. According to

Elias Najera, Hernandez and Najera were joking around and talking, when Hernandez called Najera a "jota" (translated as "faggot"). Najera said, "I don't want you to call me that." Hernandez replied, "You don't want me to call you a fag? Fag." Hernandez, who was seated, stood up and pushed Najera, who fell back. Najera got up, and he and Hernandez soon were on the ground wrestling and exchanging fists.

According to Penaloza, Hernandez said to Najera, "I want your sister[,] I like her," to which Najera responded, "well, my sister likes men, and you ain't." Hernandez then called Najera a "faggot." The name calling went back and forth, and Hernandez and Najera became increasingly angry. Penaloza went inside the house and heard Hernandez and Najera cussing and fighting. When Penaloza came out of the house, Hernandez and Najera had been separated.

Arturo Herrera, who lived in a rented house at the rear of the property, separated Najera and Hernandez. Najera angrily told Hernandez, "it's not going to end like this." The owner of the house told Najera and Hernandez he would contact the police if they did not stop fighting.

Hernandez sat down in a chair in the front yard. Najera went inside the house. He walked past Rosalba Velasquez, who was at the house visiting her mother, and asked her to tell Hernandez to pay the $50 Hernandez owed him. Najera went into the bathroom and shut the door. He emerged a few minutes later, went to the kitchen, and then went to his bedroom. A few minutes later, Najera emerged from his bedroom and walked outside into the front yard. He had been inside the house for about five to 10 minutes.

Najera walked straight toward Hernandez, who was still sitting in the chair. Najera used a knife taken from the kitchen to slash Hernandez's stomach three times. Hernandez stood and cried, "what happened?" Najera then slashed Hernandez's left elbow with the knife and said, "I told you. I told you."

Hernandez, bleeding profusely, went inside the house and asked Velasquez to call the police or the paramedics. Hernandez went back outside and sat down near the driveway.

Velasquez dialed 911 on her cell phone, but was so scared she could not speak. She went outside and handed the telephone to Herrera, who spoke to the 911 operator.

Najera stood in the front yard with a beer in one hand and a bloody knife in the other. After Herrera announced the police were on their way, Najera left and started walking down the street. He passed four or five houses and then ran.

In the early evening of August 28, Santa Ana Police Officer Caprice Kirkpatrick received a call about a stabbing at a house on South Golden West. On her way to the scene, she saw a man matching the description given her of the stabbing suspect. It was Najera. She arrested him.

The paramedics arrived at the house and transported Hernandez to University of California, Irvine Medical Center. Hernandez had lacerations to his diaphragm and elbow, and a deep laceration to his liver. Surgical efforts to save Hernandez failed, and he died about nine hours later. The official cause of death was described as "sharp force injuries of the thorax and abdomen."

The knife used to slash Hernandez was never found. In the kitchen of the house on South Golden West, the police found a butcher-block knife holder. Some of the knives had been removed and placed on a table.

### Proceedings in the Trial Court

The information charged Najera with first degree murder (Pen. Code, § 187, subd. (a)). The information also alleged Najera personally used a deadly or dangerous weapon within the meaning of Penal Code section 12022, subdivision (b)(1), but this enhancement was dismissed at trial. The jury convicted Najera of second degree murder. The trial court denied Najera's motion to reduce the conviction to voluntary manslaughter.

### Analysis

#### I.  The Trial Court Did Not Err in Excluding Evidence of a Statement Najera Made to a Police Interviewer.

##### A.  Background.

Two Santa Ana police officers interviewed Najera after he was taken into custody and before Hernandez died. The interview was conducted and recorded in Spanish, and was transcribed with an English translation. One of the officers asked Najera how many times he stabbed Hernandez. Najera said he did not know. The interviewer then asked Najera whether he stabbed Hernandez "ten times, twenty times, how many times?" Najera responded, "[a]y, officer . . . if I had (hit) him twenty or thirty time[s] I would have killed him."

Najera twice sought to introduce that statement at trial. At a pretrial hearing, Najera's counsel argued the statement was not hearsay, but was

"circumstantial evidence of the defendant's intent to kill, or lack of intent to kill, or premeditation, or lack of premeditation, specifically." The statement, Najera's counsel asserted, was "reflective of [Najera's] state of mind" in that Najera "basically said, if I had stabbed him the number of times that you suggest, I would have killed the guy. And that's not possible because I only stabbed him once or twice. Meaning, I didn't intend to kill the guy."

The trial court asked how Najera's counsel intended to introduce the statement made in the police interview because the prosecution did not intend to introduce the statement during its case-in-chief. Najera's counsel stated he did not intend to have Najera testify, but intended to introduce the statement by cross-examining the interviewing officers, or "if necessary, [he] would call that officer for the limited purpose of offering those statements as circumstantial evidence of [Najera]'s lack of intent." The trial court decided a ruling at that time was unnecessary.

After the prosecution put on all of its witnesses, Najera's counsel again asked the court to rule on the admissibility of the statement made during the police interview. The court described the statement as a hearsay admission lacking "trustworthiness in terms of the reason for the hearsay rule." The court held the statement inadmissible under Evidence Code section 352 because the statement (1) had "very marginal relevance" and (2) would be misleading in isolation and without cross-examination of the declarant.

### B. *The Trial Court Acted Within Its Discretion in Excluding Najera's Statement Under Evidence Code Section 352.*

For purposes of this opinion, we will assume the statement is not hearsay because it was offered to show Najera's intent. (Evid. Code, § 1250.) As such, the trial court did not abuse its discretion in concluding the risk of misleading the jury outweighed the statement's relevance. (Evid. Code, § 352; see *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124 [36 Cal.Rptr.2d 235, 885 P.2d 1].)

Najera's statement, "if I had (hit) him twenty or thirty time[s] I would have killed him," is ambiguous. The inference Najera advances—that he did not intend to kill Hernandez—is weak. A more plausible interpretation is the statement is a hearsay statement of the fact Hernandez would be dead if he had been stabbed 20 or 30 times. The statement's ambiguity, and the weakness of the inference favorable to Najera, not only diminished the

statement's relevance, but enhanced the risk its admission would have misled the jury. In excluding the statement, the trial court did not exercise its discretion " 'in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*People v. Rodrigues, supra,* 8 Cal.4th at p. 1124.)

### C. *Any Error Was Harmless.*

■ If the trial court erred in excluding the evidence, Najera suffered no prejudice. We assess prejudice under the standard of *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243], even though the statement was the only evidence Najera intended to submit in his defense. "As a general matter, the '[a]pplication of the ordinary rules of evidence . . . does not impermissibly infringe on a defendant's right to present a defense.' " (*People v. Fudge* (1994) 7 Cal.4th 1075, 1102–1103 [31 Cal.Rptr.2d 321, 875 P.2d 36].) "Although completely excluding evidence of an accused's defense theoretically could rise to this level, excluding defense evidence on a minor or subsidiary point does not impair an accused's due process right to present a defense." (*Id.* at p. 1103.)

Here, the trial court did not categorically deny Najera the right to present a defense or preclude him from presenting whole categories of evidence based on a priori or per se determinations of relevance. (See *People v. Hawthorne* (1992) 4 Cal.4th 43, 58 [14 Cal.Rptr.2d 133, 841 P.2d 118].) Rather, the trial court applied ordinary rules of evidence to exclude one statement, which happened to be the only evidence Najera intended to offer in defense.

It was not reasonably probable Najera would have received a favorable result if the statement had been admitted. The evidence Najera intended to kill was overwhelming: Najera was angry because Hernandez had called him a name. Najera took a knife from the kitchen and, after leaving the house, walked directly to Hernandez and slashed him in a vital region three times. When Hernandez stood and asked what was going on, Najera slashed him again. The knife's blade was five to six inches long. Hernandez died from lacerations to his diaphragm and a deep laceration to his liver.

### II. *The Prosecutor Committed Misconduct During Closing Argument. However, Defense Counsel Failed to Object, and the Deficiency Was Not Prejudicial.*

### A. *Background: The Prosecutor's Misstatements.*

Najera argues his conviction should be reduced to voluntary manslaughter because the prosecutor misstated the law of murder and voluntary manslaughter during closing argument. These asserted misstatements fall into six

categories: (1) describing voluntary manslaughter as a legal fiction that results in throwing the defendant a "bone" or giving him a break; (2) describing sudden quarrel or heat of passion as an element of second degree murder; (3) equating sudden quarrel or heat of passion with the defense-of-others defense; (4) equating malice with intent to kill; (5) arguing sudden quarrel or heat of passion is an element of voluntary manslaughter; and (6) arguing sudden quarrel or heat of passion was limited to the situation in which the defendant's conduct was a reasonable response to circumstances. Each category is discussed in turn.

### 1. *Voluntary Manslaughter as "Legal Fiction"*

On at least five occasions during closing argument and rebuttal, the prosecutor described voluntary manslaughter as a "legal fiction." The prosecutor stated: "The law says—and this is the legal fiction—that malice is negated by actual but unreasonable need for self-defense, heat of passion, or sudden quarrel. [¶] If you have a righteous set of facts that fit[s] into one of these three exceptions, the law says you can cut the defendant a break and not go murder and go voluntary manslaughter." Later, the prosecutor stated: "Now, the legal fiction that I told you about earlier, basically what the law does is they say, we're going to negate this malice, this intent to kill, or this conscious disregard for human life. We're going to negate that if you have sudden quarrel, heat of passion . . . . [¶] . . . [¶] That's the little [*sic*] fiction, folks. And if you have that legal fiction, if you have a situation that fits into that, then it's a voluntary manslaughter."

During rebuttal, the prosecutor stated: "Manslaughter is a legal fiction in which the courts—or the law[—]allows somebody who has actually intended to kill somebody, gives them a break and says, you know what? You acted as a reasonable person in such a heat of passion that we're going to give you the break." In arguing this was not a heat of passion case, the prosecutor stated, this "is not the type of case that the law is referring to to throw the defendant a bone, if you will."

The prosecutor's comment about giving Najera a break or throwing him a bone can be excused as vigorous argument. (*People v. Young* (2005) 34 Cal.4th 1149, 1192 [24 Cal.Rptr.3d 112, 105 P.3d 487].) But describing voluntary manslaughter as a legal fiction was misleading, if not inaccurate. A legal fiction is an "assumption that something is true even though it may be untrue, made esp. in judicial reasoning to alter how a legal rule operates; specif., a device by which a legal rule or institution is diverted from its original purpose to accomplish indirectly some other object." (Black's Law

Dict. (8th ed. 2004) p. 913, col. 1.) With voluntary manslaughter, lack of malice is not assumed; rather, a defendant acting in a sudden quarrel or heat of passion lacks malice necessary for murder. (*People v. Blakeley* (2000) 23 Cal.4th 82, 87–88 [96 Cal.Rptr.2d 451, 999 P.2d 675].)

Whether technically accurate or not, referring to voluntary manslaughter as a legal fiction misleadingly suggested it is not a real crime. The jury likely would not have understood the concept of a legal fiction or the difference between a legal fiction and a fiction as understood in everyday life. Describing voluntary manslaughter as a legal fiction could have led the jury to believe it was not a real crime and should not be considered seriously.

### 2. *Sudden Quarrel or Heat of Passion as Basis for Second Degree Murder*

During rebuttal, the prosecutor suggested sudden quarrel or heat of passion could be a basis for convicting Najera of second degree murder: "I submit this case is a first degree murder. Let me show you some facts to show you an analogy where it wouldn't be a first degree, it would be a second in this case. Had the defendant and the victim gotten into the initial fist fight and the defendant pulled out a knife and stabbed him right away, see the difference? That arguably would be a murder in the second degree. Why? Because during that first fist fight he yanks out the knife and stabs him. Heat of passion, sudden quarrel."

This misstates the law. The unlawful killing of a person on a sudden quarrel or heat of passion is voluntary manslaughter (Pen. Code, § 192, subd. (a)), not murder of any degree. However, in other parts of closing argument, the prosecutor correctly stated an unlawful killing on a sudden quarrel or heat of passion was voluntary manslaughter.

### 3. *Sudden Quarrel or Heat of Passion and Defense-of-another Defense*

The prosecutor also confused heat of passion with the defense-of-others defense by arguing this analogy: "You think there's an intruder in the house. Your son or daughter is yelling for help. You grab that gun and go into that bedroom of your son or your daughter, and lo and behold, what do you see? You see somebody molesting your child, God forbid. And what do you do? You pull out your gun and you shoot that person who's molesting your child. [¶] That is a voluntary manslaughter. That's the kind of case that the law says, even though the elements of the murder are there, you intended to kill

this person, but the circumstances are such that, you know what? We're going to give you a bone, if you will, and it's going to be reduced to voluntary manslaughter because it's sudden quarrel, heat of passion. You're so inflamed, as a reasonable person would be in that same situation, that you killed this person that's molesting your child."

Najera argues this example conflates heat of passion or a sudden quarrel with legal justification of defense of others. The parent in this example, Najera asserts, was not guilty of voluntary manslaughter but committed a justifiable homicide under Penal Code section 197. The Attorney General argues the example provided an apt analogy because the parent "arguably" would not have been authorized to use deadly force and therefore would be guilty of voluntary manslaughter.

The killing in the example appears to be justified under Penal Code section 197, subdivision 3 because it would have been committed in the lawful defense of a child and there was a reasonable ground to apprehend a design to commit a felony or inflict great bodily injury. The prosecutor's example thus overstated the level of provocation needed to arouse heat of passion sufficient to negate malice, suggesting that circumstances justifying homicide under Penal Code section 197 are necessary to inflame the reasonable person.

#### 4.  *Equating Malice with Intent to Kill*

Najera argues the prosecutor equated malice with intent to kill by stating, "this malice, this intent to kill." Placed in context, the statement appears to have been a slip of the tongue, a reporting error, or at most a harmless mistake. The prosecutor stated: "Now, the legal fiction that I told you about earlier, basically what the law does is they say, we're going to negate *this malice, this intent to kill*, or this conscious disregard for human life. We're going to negate that if you have sudden quarrel, heat of passion, or actual but unreasonable belief in the necessity to defend, okay." (Italics added.)

That passage could be interpreted as saying a sudden quarrel or heat of passion negates malice, which is the same as intent to kill, or negates conscious disregard of life. Alternatively, the passage could be interpreted as saying a sudden quarrel or heat of passion negates malice, intent to kill, or conscious disregard of life. Either way, the effect of the statement is the same—a sudden quarrel or heat of passion negates an essential element of murder.

#### 5.  *Sudden Quarrel or Heat of Passion as an Element of Voluntary Manslaughter*

Najera contends that in closing argument the prosecutor omitted the absence of a sudden quarrel or heat of passion as an element of murder and

included it as an element of voluntary manslaughter. In reviewing the elements of murder, the prosecutor did not mention absence of sudden quarrel or heat of passion. Absence of a sudden quarrel or heat of passion is a fact the prosecution must prove beyond a reasonable doubt when murder and voluntary manslaughter are under joint consideration. (*People v. Rios* (2000) 23 Cal.4th 450, 454, 462 [97 Cal.Rptr.2d 512, 2 P.3d 1066].) But the prosecutor did explain that sudden quarrel or heat of passion negates malice, a correct statement. (*Ibid.*) The prosecutor did not describe a sudden quarrel or heat of passion as an element of voluntary manslaughter; rather, the prosecutor explained a sudden quarrel or heat of passion may reduce a murder to voluntary manslaughter, a correct statement. (*Ibid.*; see also Pen. Code, § 192, subd. (a).)

### 6. Sudden Quarrel or Heat of Passion Limited to Situation in Which Defendant's Conduct Was a Reasonable Response

Finally, Najera argues the prosecutor told the jury on two occasions the determination of heat of passion should be based on the defendant's conduct rather than the circumstances in which the defendant was placed. During closing argument, the prosecutor stated: "Heat of passion is not measured by the standard of the accused. We don't care what the accused did. We don't care what the standard is for the accused. As a jury, you have to apply a reasonable, ordinary person standard, okay. [¶] Going back to that intruder hypothetical. *Any reasonable, ordinary person walking in on a child being molested, if they had a gun in their hand, would probably do the same thing.* It's that same hypothetical that was given to you in voir dire by defense. Remember the spider in the sink, the reasonable spectrum? *Would a reasonable person do what the defendant did?* Would a reasonable person be so aroused as to kill somebody? That's the standard." (Italics added.)

During rebuttal, the prosecutor stated: "[*T*]*he reasonable, prudent person standard . . . [is] based on conduct, what a reasonable person would do in a similar circumstance.* Pull out a knife and stab him? I hope that's not a reasonable person standard." (Italics added.)

The italicized portions of the prosecutor's statements are incorrect. An unlawful homicide is upon " 'a sudden quarrel or heat of passion' " if the killer's reason was obscured by a " 'provocation' " sufficient to cause an ordinary person of average disposition to act rashly and without deliberation. (*People v. Breverman* (1998) 19 Cal.4th 142, 163 [77 Cal.Rptr.2d 870, 960 P.2d 1094].) The focus is on the provocation—the surrounding circumstances—and whether it was sufficient to cause a reasonable person to act rashly. How the killer responded to the provocation and the reasonableness of the response is not relevant to sudden quarrel or heat of passion.

The prosecutor interspersed correct statements of the law with the incorrect ones stating, for example, "[w]ould a reasonable person be so aroused as to kill somebody? That's the standard." The effect of the prosecutor's statements was, however, to create confusion. Does the jury determine sudden quarrel or heat of passion based on the level of provocation or on the defendant's conduct in response to the provocation? The jury was confused on that issue and submitted a written question to the trial court asking whether "[u]nder voluntary manslaughter rule does the reasonable person *test* apply not only to the 'aroused passions' but also apply to the '*conduct*' of this person. [¶] The act resulting from the passion." The court wrote in response: "If the Court is understanding your question, I believe the answer may be in Instruction 8.42, found on page 37 of the packet, to be considered . . . with all the Court's instructions."

The trial court correctly instructed the jury to follow the court's instructions, not the attorneys' description of the law, to the extent there was a conflict. We presume the jury followed that instruction. (*People v. Boyette* (2002) 29 Cal.4th 381, 436 [127 Cal.Rptr.2d 544, 58 P.3d 391].)

## B. *Najera Forfeited Any Claim of Error Based on Prosecutorial Misconduct.*

■ Najera's trial counsel did not object at trial to any of the challenged statements. To preserve for appeal a claim of prosecutorial misconduct, the defendant must make a timely objection at trial and request an admonition to the jury. (*People v. Farnam* (2002) 28 Cal.4th 107, 167 [121 Cal.Rptr.2d 106, 47 P.3d 988].) A defendant is excused from the necessity of objecting and requesting an admonition if either would have been futile. (*Ibid.*; *People v. Hill* (1998) 17 Cal.4th 800, 820 [72 Cal.Rptr.2d 656, 952 P.2d 673].)

In this case, posing objections and requesting admonitions would not have been futile. The trial court immediately could have corrected misleading or inaccurate statements of the law and could have warned the prosecutor not to repeat them. Had defense counsel requested admonitions, we are reasonably sure the trial court would have given them.[1] Defense counsel's failure to make timely objections and requests for admonishment therefore bars Najera from challenging the prosecutor's comments on direct appeal.

---

[1] In one instance, defense counsel did object when the prosecutor argued the jury had to unanimously agree Najera's conduct was reasonable to convict him of manslaughter. The court immediately admonished the jury, "the instructions I'll give you in a few moments will be what you go by, not the statements of counsel."

### C. *Defense Counsel Was Not Ineffective Because Najera Was Not Entitled to a Manslaughter Instruction.*

■ Najera argues his counsel was ineffective by failing to object to the prosecutor's misstatements or by failing to request the mistakes be corrected. To prevail on a claim of ineffective assistance of counsel, the defendant must prove: (1) his or her attorney's representation was deficient in that it fell below an objective standard of reasonableness under prevailing professional standards; and (2) his or her attorney's deficient representation subjected him or her to prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 687 [80 L.Ed.2d 674, 104 S.Ct. 2052]; *People v. Cain* (1995) 10 Cal.4th 1, 28 [40 Cal.Rptr.2d 481, 892 P.2d 1224].) Prejudice means a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland v. Washington, supra,* 466 U.S. at p. 694.) A reasonable probability means a "probability sufficient to undermine confidence in the outcome." (*Ibid.*)

After oral argument, we requested supplemental briefing from the parties addressing two issues: "1. What was the provocative conduct, if any, justifying an instruction on voluntary manslaughter under Penal Code section 192, subdivision (a). [¶] 2. Was that conduct sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection." Najera and the Attorney General submitted letter briefs in response. We have considered those briefs and conclude Najera suffered no prejudice from his counsel's failure to object to the prosecutor's misstatements because the evidence did not "properly present[]" the issue of sudden quarrel or heat of passion. (*Mullaney v. Wilbur* (1975) 421 U.S. 684, 704 [44 L.Ed.2d 508, 95 S.Ct. 1881].) In other words, Najera suffered no prejudice because he was not entitled to an instruction on voluntary manslaughter in the first place.

■ As explained *ante,* voluntary manslaughter is an unlawful killing of a human being without malice "upon a sudden quarrel or heat of passion." (Pen. Code, § 192, subd. (a).) In *People v. Lee* (1999) 20 Cal.4th 47, 59 [82 Cal.Rptr.2d 625, 971 P.2d 1001], the court explained: "Although [Penal Code] section 192, subdivision (a), refers to 'sudden quarrel or heat of passion,' the factor which distinguishes the 'heat of passion' form of voluntary manslaughter from murder is provocation. The provocation which incites the defendant to homicidal conduct in the heat of passion must be caused by the victim [citation], or be conduct reasonably believed by the defendant to have been engaged in by the victim. [Citations.] The provocative conduct by the victim may be physical or verbal, but the conduct must be sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection. [Citations.]" The test for adequate provocation is objective. (*Id.* at p. 60.)

■ What was the provocative conduct in this case? Hernandez called Najera a "faggot." That taunt would not drive any ordinary person to act rashly or without due deliberation and reflection. " 'A provocation of slight and trifling character, such as words of reproach, however grievous they may be, or gestures, or an assault, or even a blow, is not recognized as sufficient to arouse, in a reasonable man, such passion as reduces an unlawful killing with a deadly weapon to manslaughter.' " (*People v. Wells* (1938) 10 Cal.2d 610, 623 [76 P.2d 493].)

■ In *People v. Manriquez* (2005) 37 Cal.4th 547, 586 [36 Cal.Rptr.3d 340, 123 P.3d 614], the victim called the defendant a " 'mother fucker' " and taunted him by repeatedly asserting that if the defendant had a weapon, he "should take it out and use it." The California Supreme Court stated such declarations "plainly were insufficient to cause an average person to become so inflamed as to lose reason and judgment" and held "[t]he trial court properly denied defendant's request for an instruction on voluntary manslaughter based upon the theory of a sudden quarrel or heat of passion." (*Ibid.*) Calling Najera a "faggot" was equally insufficient to cause an ordinary person to lose reason and judgment under an objective standard.[2] Najera was not entitled to a voluntary manslaughter instruction; therefore, defense counsel's failure to object to the prosecutor's misconduct did not cause Najera to suffer any prejudice.

III. *Because Najera Was Not Entitled to a Voluntary Manslaughter Instruction, We Need Not Address Issues Regarding CALJIC No. 8.42.*

Najera argues CALJIC No. 8.42, explaining sudden quarrel/heat of passion, is ambiguous as to whether the reasonable person test is the standard for becoming aroused or the standard for acting after becoming aroused. Because, as we hold *ante*, Najera was not entitled to a voluntary manslaughter instruction in the first place, we need not address his challenge to CALJIC No. 8.42. For the same reason, we need not address whether the trial court's reference to CALJIC No. 8.42 and the other instructions was a sufficient response to the jury's question regarding the voluntary manslaughter reasonable person standard.

[2] Najera asserts the provocative conduct included no only name-calling, but also the victim's pushing Najera, which caused him to fall to the ground and prompted a fight between the two. We do not believe such a physical attack on Najera makes a difference in the analysis. Calling Najera a "jota" and pushing him are not sufficiently provocative under an objective standard to cause an ordinary person of average disposition to act rashly or without due deliberation.

#### IV. *The Order of the Jury Instructions Did Not Cause the Jury to Convict Najera of Murder Without Considering Each of Its Elements.*

Najera argues the jury instructions on murder and manslaughter were organized in an erroneous manner that led the jury to convict him of murder before considering whether the killing was on a sudden quarrel or heat of passion.

Before *Mullaney v. Wilbur, supra,* 421 U.S. 684, sudden quarrel or heat of passion was considered an element of voluntary manslaughter. In *Mullaney v. Wilbur,* the Supreme Court held "the Due Process Clause requires the prosecution to prove beyond a reasonable doubt the absence of the heat of passion on sudden provocation when the issue is properly presented in a homicide case." (*Id.* at p. 704.) When a jury must consider both murder and voluntary manslaughter, heat of passion is not an element of voluntary manslaughter; rather, the absence of heat of passion is an element of murder the prosecution must prove beyond a reasonable doubt. (*People v. Rios, supra,* 23 Cal.4th at pp. 454, 462.)

In response to *Mullaney v. Wilbur,* the CALJIC instructions were modified to add to CALJIC No. 8.50 this sentence: "To establish that a killing is murder [other than felony murder] and not manslaughter, the burden is on the People to prove beyond a reasonable doubt each of the elements of murder and that the act which caused the death was not done [in the heat of passion or upon a sudden quarrel] . . . ." CALJIC No. 8.50 is titled "Murder and Manslaughter Distinguished" and appears in order after the instructions on voluntary and involuntary manslaughter. The instructions defining murder and malice and listing their elements do not include absence of sudden quarrel or heat of passion. (See CALJIC Nos. 8.00, 8.10, 8.11, 8.20, 8.30, 8.31.)

The CALJIC instructions place the murder instructions before the manslaughter instructions. When a defendant is charged with a greater offense and lesser included offenses, CALJIC No. 17.10, the so-called acquittal first rule, permits the jury to stop deliberating once it unanimously agrees the defendant is guilty of the greater offense.

Najera asserts a jury deliberating the charges in the order of the instructions would first consider the greater crime of murder. If the jury were to agree unanimously the defendant was guilty of murder, then under CALJIC No. 17.10, the jury could end deliberations and return a verdict *before* considering absence of a sudden quarrel or heat of passion because that instruction does not appear until after the manslaughter instructions. By doing so, Najera argues, the jury could improperly convict a defendant of murder without considering all of its elements.

Whatever the merit of Najera's argument in the abstract, in reality, the order of jury instructions did not lead to an improper conviction in this case. The trial court read the instructions in their entirety to the jury after closing argument. The jury therefore heard the instruction on the prosecution's burden of proving absence of sudden quarrel or heat of passion before retiring to deliberate. We presume, of course, the jury understood and considered all of the instructions as a whole, in whatever order they might have been. (See CALJIC No. 1.01.) Here, we can do more than presume: We know the jury seriously considered voluntary manslaughter and sudden quarrel or heat of passion because the jury asked whether the reasonable person standard applied to the provocation or to defendant's conduct in response to the provocation. The court directed the jury to CALJIC No. 8.42. The jury, we can be sure, either was applying all the facts to all elements of all crimes, greater or lesser, before passing judgment, or was starting with the lesser included offense of voluntary manslaughter.[3] Najera concedes using either of those sequences of deliberation does not create a problem.

## V.   *There Was No Cumulative Error.*

Najera argues the cumulative effect of the trial court's errors and his trial counsel's ineffectiveness deprived him of a fair trial and requires reduction of the conviction to voluntary manslaughter. In analyzing a claim of prejudicial error, we ask whether a series of trial errors, though independently harmless, rise by accretion to the level of reversible and prejudicial error. (*People v. Cunningham* (2001) 25 Cal.4th 926, 1009 [108 Cal.Rptr.2d 291, 25 P.3d 519]; *People v. Hill, supra*, 17 Cal.4th 844.)

The prosecutor in this case did commit misconduct, but defense counsel did not object and there was no ineffective assistance of counsel. We have rejected Najera's other claims of error. Even were we to conclude that the trial court erred by excluding Najera's statement made during the police interview and that the instructions were given in a problematic order, we would not say the whole of the trial court's errors outweighed the sum of their parts (*People v. Roberts* (1992) 2 Cal.4th 271, 326 [6 Cal.Rptr.2d 276, 826 P.2d 274]), a result more favorable to Najera would have been reached in the absence of the errors (*People v. Bunyard* (1988) 45 Cal.3d 1189, 1237 [249

---

[3] Najera asserts a jury may validly choose one of three sequences when deciding charges involving greater and lesser included crimes: (1) "[A]pply all facts to all elements for all crimes, both greater and lesser, while withholding judgment until done"; (2) "[d]ecide greater and lesser crimes one by one beginning with the least included and moving to a greater includ[ed] crime only after unanimously agreeing on guilt as to the lesser"; or (3) "[d]ecide greater and lesser crimes one by one beginning with the greatest and moving to a lesser crime only after unanimously rejecting guilt as to the greater." According to Najera, the ordering of the instructions and CALJIC No. 17.10 can create reversible results if the jury uses the *third* sequence.

Cal.Rptr. 71, 756 P.2d 795]), or Najera suffered a miscarriage of justice (*People v. Hill, supra*, 17 Cal.4th at p. 844).

DISPOSITION

The judgment is affirmed.

Sills, P. J., and Aronson, J., concurred.

A petition for a rehearing was denied April 20, 2006, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied June 28, 2006, S143322. Kennard, J., was of the opinion that the petition should be granted.