Filed 4/28/16  P. v. Yim CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>　　　　Plaintiff and Respondent,<br><br>v.<br><br>DOUGLAS K. YIM,<br><br>　　　　Defendant and Appellant. | A140694<br><br>(Alameda County<br>Super. Ct. No. C168147) |

Defendant Douglas K. Yim was convicted by a jury of first degree murder of Dzuy Phan (Pen. Code, § 187, subd. (a)), with enhancements for personal discharge of a firearm causing death (Pen. Code, § 12022.53, subd. (d)), and personal use of a firearm (Pen. Code, § 12022.5, subd. (a)).  The jury convicted him of two offenses against Paul Park:  mayhem (Pen. Code, § 203), with enhancements for personal discharge of a firearm causing great bodily injury (Pen. Code, § 12022.53, subd. (d)), infliction of great bodily injury (Pen. Code, § 12022.7, subd. (a)), and personal use of a firearm (Pen. Code, § 245, subd. (a)(2)); and assault with a firearm (Pen. Code, § 245, subd. (a)(2)), with enhancements for personal use of a firearm (Pen. Code, § 12022.5, subd. (a)), and infliction of great bodily injury (Pen. Code, § 12022.7, subd. (a)).  Yim was sentenced to 75 years to life on the murder count.  The court imposed a concurrent sentence of 33 years to life on the mayhem count, and stayed a 17-year sentence on the assault count.

Yim contends that:  (1) his counsel was ineffective because he failed to object to admission of prejudicial photographs, evidence of possession of firearms not involved in the crimes, and related testimony; (2) the prosecutor committed misconduct by misstating

1

the law of heat-of-passion voluntary manslaughter in jury arguments, and his counsel was ineffective because he failed to object to the misstatements; (3) the first degree murder conviction was not supported by substantial evidence; and (4) the court incorrectly imposed an enhancement to his sentence for mayhem. We strike the enhancement and affirm the judgment as so modified.

## I. BACKGROUND

A. Park's Testimony

Park went to his friend Yim's house to socialize on the night of April 1, 2011. Park and Yim played video games, smoked marijuana, and drank beer. They were joined by Yim's friend Phan. The three smoked marijuana, and Phan brought over a bottle of Hennessy cognac. Yim and Phan "were pounding [drinks] pretty hard," and snorting cocaine.

While they were playing video games, Yim and Phan began to argue. "[T]here was some smack talking going on while they were playing, and . . . it got a little heated." Then they argued about religion. Yim believed in god and Phan did not. They took verbal shots at each other trying to prove their points of view. After arguing for about five to ten minutes, they calmed down and went back to playing games and having fun. About 30 minutes later, Yim and Phan began arguing again. When Yim would lose a game, Phan would taunt him by asking, "Where was god there?" When Phan asked Yim where god was when his father died, Yim threw a video game controller at the TV and broke the screen.

Yim then "got kind of quiet" and had "just a blank expression on his face." Park and Phan cleaned up the broken glass, and tried to calm Yim down. Park offered to pay half the cost of a new TV, and Phan by way of apology offered to pay the other half. In response to these offers, Yim "didn't really say much" and just kind of nodded his head.

Yim went and sat in a dining area off the living room and appeared to calm down. As Park stood between them, Phan spent 15 to 30 minutes telling Yim that he was his friend and that Yim needed to calm down. Yim told Phan, " 'You need to leave.' " Phan smiled, gave Yim what Park called a "wake up push" to get his attention, and said, "I'm

2

your fucking friend." Yim gave Phan "a weird like grimace look without saying anything," and Phan said something like "I'm your fucking friend. If you want to get your gun to shoot me, then go ahead." Park did not have the impression that Phan was trying to egg Yim on. Park believed this was Phan's way of apologizing without having to lose face and say he was sorry. For the next five minutes Park stayed between Yim and Phan and tried to calm them down, saying, " 'What are you guys talking about? Why are you acting like this?' " He told Phan, " 'We should leave.' "

Without saying anything, Yim left the room and walked slowly through the kitchen. When Yim returned to the living room area less than five minutes later his attention seemed focused solely on Phan, and the look in his eyes was "kind of like a blank, kind of pent up rage." Yim was "looking right through" Phan, and Park thought the two were going to fight. Park got in between them, put his hands up and said, " 'Hold on.' " Park did not see that Yim was holding a gun. He heard a shot, his left arm "flew back," and for a time he was "blinded and deaf." Then he saw that his left wrist was gushing blood. He noticed that Phan was in a "defensive position," with an arm in front of his face, trying to shield himself from something. Park ran to the front door because he was concerned that he had to get to a hospital before he bled to death. When he got into his car across the street from the house, he heard five or six shots fired one second apart. Although his earlier testimony described a shorter timeframe, Park estimated that "[m]aybe 30 minutes" elapsed from the time Phan pushed Yim and the time he got into his car.

When Park got to the hospital he told highway patrol officers that he had been shot on the freeway because he assumed he was the only one hurt and he wanted to protect Yim. He later told police the truth, and testified that he would no longer lie to protect Yim because "[a] person's life was taken."

Park testified that due to his injury he lost feeling in three fingers, and movement and 50 to 60 percent of the muscle mass in his left hand.

B.  Other Prosecution Evidence

At 3:28 a.m. on April 2, Yim's next door neighbor Rachel Ayfer called 911 after hearing about seven gunshots.  Ayfer was familiar with guns and had been taught how to fire an M16 rifle.  The shots that night were the most rapid she had ever heard, and she believed they were from an extremely large, fully automatic weapon.  She heard a car peel out and speed away from the area of Yim's driveway.  Police were dispatched to the neighborhood and found the area clear.

Yim had a marijuana growing operation below his living area, and surveillance cameras above his garage and front porch. Video from Yim's front porch showed Park and Yim separately leaving the house between 3:33 and 3:38 a.m.

At 5:11 p.m. on April 2, Yim left a voicemail for his sister Caroline Yim. Caroline allowed police to record the message, and it was played for the jury.  Yim told Caroline she was going to hear "something really bad" and that he was "really, really, really sorry."  Yim said, "I'm gonna turn myself in . . . cause something really bad happened."  He said, "I did something very terrible," and "I swear . . . I can't control myself. . . . Tell mom I'm sorry—but . . . I'm gonna have to go away.  I have to turn myself in."

At 5:16 p.m., Yim left a message with his cousin Jayn Hong, which Hong allowed the police to record.  Yim said, "I did something really terrible here last night . . . I don't know if you heard, but I'm going to go turn myself in. . . . I have a problem, but I don't know what . . . I can do to get help.  So, I'm turning myself in."

When Caroline heard Yim's message, she called their mother, Mikyong Yim, who went to Yim's house.  Ayfer heard screaming next door, and saw Mikyong run out of the house.  She was hysterical, and said that Yim was shot in the head.  Ayfer called 911 again, and police were dispatched to the scene to investigate.

Police found Phan's body in the house, and he had been dead for at least 12 hours. Phan was unarmed and holding a cell phone to his head.  Crime scene technician Yager testified that four expended bullets and six expended rifle casings were recovered from the scene.  A firearm and cartridge expert testified that the bullets and casings all came

4

from the same AR-15 type firearm. An AR-15 is a semi-automatic rifle that can be converted to be fully automatic. Literature about converting an AR-15 to a fully automatic weapon was found in a backpack behind a couch.

Phan died from multiple gunshot wounds. A bullet grazed his right forearm and another went through the palm of his right hand. One bullet struck his left arm. A bullet entered his right front chest and another entered his left front abdomen. A bullet that entered his right ear would have been immediately fatal. The shot to Phan's head must have been the last one fired because hemorrhage around the other wounds showed that he was alive when they were inflicted. Stippling showed that the head shot was fired from less than a foot away.

Hong went to Yim's house at Caroline's request and found the police there. She called Yim's friend Thomas Jin and asked him to join her. Jin testified that he went to Yim's house in the early morning hours of April 2, and heard Yim, Phan, and Park talking, laughing, and playing video games inside. Jin did not like spending time with Park, so he left and went home. Jin had spent time with Yim and Phan together and never seen any problems between the two.

When Jin got to Yim's house the area was taped off by the police. Yim called Hong while she was with Jin at the scene and told her, " 'That's not me in there.' " Hong gave the phone to Jin, and Yim told Jin "he did something bad; he made a mistake or something like that." Yim asked Jin to retrieve a safe from inside the house. Jin told Yim that he could not go in the house because police were everywhere.

The voice mail messages Yim left with Caroline and Hong were traced to a prepaid cell phone in the Los Angeles area. Yim turned himself into police in the Fresno area on the morning of April 5.

Park's hand surgeon described his injuries as severe, permanent, and very debilitating.

B. Yim's Testimony

Yim testified that he, Phan, and Park played video games, drank Hennessy, and used cocaine and marijuana on the night of April 1. Yim told Phan that he believed in

5

god, and asked Phan about going to church. Phan disrespected him by saying he was acting like a girl when he asked about church. Phan disrespected him further by calling him a "bitch" and a "pussy" while they played video games. When Phan made a comment about Yim's father's death, Yim threw his cell phone through the TV screen. Phan and Park helped him clean up the mess, and he asked Phan to leave the house. Phan wanted to fight and taunted Yim saying, " 'show me the wrath of God,' " and pushed him. He, not Phan, said " 'I'm your . . . friend.' " He again asked Phan to leave, but Phan said, " 'I'm not leaving your house, so go get your gun.' "

When Phan said that, Yim was afraid because he thought Phan might have a gun. He knew Phan owned a pistol, and Phan was wearing baggy clothes. He immediately went and got his AR-15 rifle, which he kept in a closet in his bedroom at the back of the house. The rifle was a semi-automatic. He bought a kit to convert it to a fully automatic, but the conversion required modifications he was unable to perform. He bought the gun illegally from a friend and kept it for protection because he was selling marijuana at the house and feared a home invasion robbery.

Before he went to get the gun, he was sitting in a dining area next to the living room. He acknowledged that evidence technician Yager correctly measured the distance from the living room to the bedroom to be 21 to 24 feet. He cocked the gun in the bedroom so it would be ready to fire, and walked back to the living room where Phan was standing. He saw Phan reach into his pocket, pull out a black object he thought was a gun, and take a step toward him. He was frightened when Phan moved toward him, so he fired a shot at Phan intending to injure, not kill him. He did not remember firing any of the other shots. The next thing he remembered was the movement of a car outside. At that point he noticed that Phan was on the floor and Park had left.

He drove to the Los Angeles area and discarded the AR-15 in a dumpster along the way. When he fled, he knew he had shot Phan multiple times. He spent a couple of nights in a motel and went to see his friend Jason Paek before turning himself in.

6

When he was 17 years old, he and Paek emptied the cash register of a Korean restaurant, and robbed the patrons and employees. He spent three years in juvenile detention for that offense.

When he spoke with Jin on the night of April 2, he told Jin to get a magnetic box on the back of his refrigerator that had keys to the area where he was growing marijuana, and he hoped the police would not find the keys.

In April 2013, he was recorded telling Caroline in jail that Hong had "messed up," because "she told the DA that I wrote her a letter and told her I was drunk and I don't remember things. That I don't remember what happened at all. [¶] . . . [¶] And that's what I was gonna do at first, remember? [¶] . . . [¶] But now I have a new defense and it kind of makes me look like my new defense is a lie." He said he wrote Hong and told her "to stick to what you said in the police report. But she kind of already added extra on it. . . . But, it's okay because you know, the DA has more dirt on me. 'Cause I had these books on how to convert the gun to fully automatic. Yeah, kind of makes me look bad . . . ."

## II. DISCUSSION

A. Ineffective Assistance of Counsel

Yim contends that his counsel was ineffective because he did not object to the jury's viewing of prejudicial photographs and to introduction of evidence that Yim had owned guns other than the AR-15 used to shoot Phan.

(1) *Record*

(a) Photographs

Police found a safe in Yim's house. Yager testified that inside the safe were 29 photographs, mostly of Asian males, and a newspaper clipping that reported on the sentencing of three teenagers for beating a Santa Ana high school student to death and burying the body. Some of the subjects in the photos were holding guns and flashing what Yager called "possible gang signs." Photo 109 was a picture Yager took of the array of photos from the safe he assembled at his office. Photo 110 showed the press

7

clipping. Photos 111 and 112 were close-ups of photos in the array of people in groups and holding guns. Photo 112 included a photo identification card in Yim's name.

The photos were shown to the jury, and have been transmitted to this court for our review. Yim testified that he was not in any of the photos depicting the "quote/unquote gangsters." Those were photos of his friend Eugene Lee and his friends. When Lee was arrested in 1998, he asked Yim to keep the photos for him.

When exhibits were discussed after the close of testimony, the defense objected to admission of the photos. The prosecutor stated that Yager and Yim had testified about the photos. The court asked defense counsel why they should be excluded in light of that testimony, and counsel responded that the photos were irrelevant. The court asked why counsel had not objected earlier, counsel responded that he had, and the court observed that counsel was mistaken because no objection had been made. The prosecutor argued the photos were relevant as "circumstantial evidence of intent" because they showed that Yim was "familiar with guns, glorifies guns, glorifies murder . . . ." The court said, "I knew nothing about . . . these photographs until the technician testified to them because no one raised this issue with me. And had it been raised with me, I would have prevented any testimony about them." The court said "you can't tell" whether Yim was in any of the potentially incriminating photos, and ruled that admitting those photos would be "too prejudicial." Although Yager identified gestures in the photos as possible gang signs "that opinion is just going to invite the jury to speculate too much about the significance of these photos. [¶] So I'm not gonna let them in at this stage. That's 109 through 113."

(b) Other Guns

Hong testified without objection that two years before Phan's killing she saw Yim with a black, foot-long handgun. She said he kept it to protect his music equipment. Yager also testified without objection that the backpack behind the couch contained ammunition for a .357 caliber pistol, and that a box for nine millimeter ammunition was found in the kitchen.

Yim acknowledged that he was familiar with firearms. He testified that he had sold the gun he showed Hong, and it was a .357 revolver. He had also previously owned

8

and sold a nine millimeter handgun. He had fired those guns at a shooting range, but never fired the AR-15 before killing Phan.

(2) *Analysis*

"A defendant claiming ineffective assistance of counsel under the federal or state Constitution must show both deficient performance under an objective standard of professional reasonableness and prejudice under a test of reasonable probability of a different outcome." (*People v. Ochoa* (1998) 19 Cal.4th 353, 414.) A reasonable probability is a probability sufficient to undermine confidence in the result. (*People v. Lucas* (1995) 12 Cal.4th 415, 436.)

Defense counsel provided ineffective assistance when he failed to object to the jury's viewing of the photographs found in Yim's safe. We cannot discern, and the record fails to show that counsel had no tactical reason for failing to object. The objection would have been sustained had it been made. The photographs had little or no probative value, and were potentially prejudicial because, as the prosecutor stated, they could be taken to show that Yim "glorified" guns and murder, and, as Yager testified, they suggested possible gang involvement. (*People v. Memory* (2010) 182 Cal.App.4th 835, 862 [" 'legions of cases and other legal authorities have recognized the prejudicial effect of gang evidence upon jurors' "].

We will assume for purposes of this opinion that counsel was also ineffective for failing to object to evidence that Yim had owned guns other than the AR-15. (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1056 ["[w]hen the prosecution relies on evidence regarding a specific type of weapon, it is error to admit evidence that other weapons were found in the defendant's possession, for such evidence tends to show not that he committed the crime, but only that he is the sort of person who carries deadly weapons"]; *People v. Henderson* (1976) 58 Cal.App.3d 349, 360 ["[e]vidence of possession of a weapon not used in the crime charged against a defendant leads logically only to an inference that defendant is the kind of person who surrounds himself with deadly weapons—a fact of *no relevant* consequence to determination of the guilt or innocence of the defendant"].)

However, there is no reasonable probability that counsel's ineffectiveness or the evidence in question affected the verdicts. The evidence was entirely tangential to the prosecution's case. It would not have been surprising or meaningful to the jury that Yim, who admitted being knowledgeable about guns, illegally possessed a semi-automatic assault rifle, and attempted to convert that rifle to a fully automatic weapon, owned two other handguns in the past. The photos were shown to the jury only in passing and were not ultimately admitted into evidence. Our review of the photos leads us to conclude it is most unlikely they would have left any indelible impression of Yim that would have caused the jury to convict him of crimes if they otherwise would not. It was unclear whether Yim was in any of the potentially incriminating photos, and whether any of them depicted gang activity. Neither the jury's viewing of the photos nor the admission of the other guns evidence undermines our confidence in the verdicts.

B. Prosecutorial Misconduct

Yim argues that the prosecutor committed misconduct by misstating the law on heat-of-passion voluntary manslaughter.

(1) *Jury Instructions*

The jury was instructed pursuant to CALCRIM No. 522: "Provocation may reduce a murder from first degree to second degree and may reduce a murder to manslaughter. The weight and significance of the provocation, if any, are for you to decide. If you conclude that the defendant committed murder, but was provoked, consider the provocation in deciding whether the crime was first- or second-degree murder. Also consider the provocation in deciding whether the defendant committed murder or manslaughter."

The jury was instructed pursuant to CALCRIM No. 570: "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion. The defendant killed someone because of a sudden quarrel if: [¶] 1. The defendant was provoked; [¶] 2. As a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured his reasoning or judgment; [¶] And [¶] 3. The provocation would

10

have *caused a person of average disposition to act rashly and without due deliberation; that is, from passion rather than from judgment*." (Italics added.)

The jury was instructed pursuant to CALCRIM No. 200: "You must follow the law as I explain it to you, even if you disagree with it. If you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions."

(2) *Jury Arguments*

At times in her closing arguments, the prosecutor adhered to the instructional language we have highlighted in CALCRIM No. 570 when she described the provocation required for heat of passion voluntary manslaughter. But at other times she differently described the necessary provocation. At one point she said, "*A reasonable person in this situation would not have* acted from passion rather than judgment and *murdered someone . . .*—over a comment of 'I'm your fucking friend' and one push." (Italics added.) At another point she said, "*It's based on a reasonable person standard, whether an average person in the same situation would act the same way* and react from passion rather than from judgment . . . ." (Italics added.)

Yim's closing argument touched only briefly on the provocation standard: "[One of the] theories that the law permits you to take second-degree murder to manslaughter is what the People called earlier—the government called earlier was provocation, also known as 'passionate.' If you find there was a sudden quarrel, heat of passion that meets the standards for that, then that second-degree murder gets reduced to manslaughter. [¶] Was there a quarrel here? Yes. Your determination about that quarrel is your call. That's why you are here. That's why we need you to make the call. We obviously could not."

(3) *Analysis*

Yim contends that when the prosecutor argued provocation by saying that "murder[ing] someone" was not a reasonable reaction, she misstated the law like the prosecutors did in *People v. Najera* (2006) 138 Cal.App.4th 212 (*Najera*) and *People v. Beltran* (2013) 56 Cal.4th 935 (*Beltran*).

11

In *Najera*, the defendant got a knife and stabbed the victim to death five or ten minutes after the victim called him a "faggot," pushed him to the ground, and punched and wrestled with him. (*Najera*, *supra*, 138 Cal.App.4th at p. 216.) In closing argument, the prosecutor illustrated voluntary manslaughter with a hypothetical about a parent shooting someone he finds molesting his child. (*Id.* at p. 221.) The prosecutor argued: "Any reasonable, ordinary person walking in on a child being molested, if they had a gun in their hand, would probably do the same thing. . . . Would a reasonable person do what the defendant did? Would a reasonable person be so aroused as to kill somebody? . . . [¶] . . . [T]he reasonable, prudent person standard . . . [is] based on conduct, what a reasonable person would do in a similar circumstance." (*Id.* at p. 223, italics omitted.)

These arguments were held to incorrectly tell the jury that "the determination of heat of passion should be based on the defendant's conduct rather than the circumstances in which the defendant was placed." (*Najera*, *supra*, 138 Cal.App.4th at p. 223.) Instead, "[a]n unlawful homicide is upon 'a sudden quarrel or heat of passion' if the killer's reason was obscured by a ' "provocation" ' sufficient to cause an ordinary person of average disposition to act rashly and without deliberation. [Citation.] The focus is on the provocation—the surrounding circumstances—and whether it was sufficient to cause a reasonable person to act rashly. How the killer responded to the provocation and the reasonableness of the response is not relevant to sudden quarrel or heat of passion." (*Ibid.*) The court acknowledged that the prosecutor interspersed correct statements of the law with the incorrect ones, but "[t]he effect of the prosecutor's statements was . . . to create confusion." (*Id.* at p. 224.)

*Beltran* reaffirmed the heat of passion standard articulated and applied in *Najera* and other cases. "[T]he fundamental 'inquiry is whether or not the defendant's reason was, at the time of his act, so disturbed or obscured by some passion—not necessarily fear and never, of course, the passion for revenge— to such an extent as would render ordinary men of average disposition liable to act rashly or without due deliberation and reflection, and from this passion rather than from judgment.' " (*Beltran*, *supra*, 56 Cal.4th at p. 948.) The People's proposed standard in *Beltran* "requiring such

12

provocation that the ordinary person of average disposition would be move to *kill* focuse[d] on the wrong thing. The proper focus is placed on the defendant's state of mind, not his particular act. To be adequate, the provocation must be one that would cause an emotion so intense that an ordinary person would simply *react*, without reflection." (*Id.* at p. 949.)

The prosecutor's jury argument in *Beltran* "arguably approached the improper argument condemned in [*Najera*.]" (*Beltran*, *supra*, 56 Cal.4th at p. 954, fn. 15.) The defendant in *Beltran* claimed to have killed the victim after she told him she had aborted his child, a statement the prosecutor argued the victim never made. The prosecutor elaborated: " 'And the provocation has to be such that a person of average disposition to act with passion rather than judgment (*sic*). We would have probably millions more homicides a year if everyone could use words that may be—although I don't disbelieve. I don't agree that this is what happened. Its an illogical interpretation of the facts. You stub your toe. You're angry, might cuss a few words. You don't go out and kill somebody. [¶] We've all gotten cut off in traffic. We say the few choice words, "Oh, my God." We don't gun the pedal and start trying to hit the car in front of us to try to kill the person who cut us off. Can you imagine if that was permissible, "Oh, my God, I acted . . . without judgment and rash. I got so angry. I was insulted." That's not the standard. It's a reasonable person, and you're all reasonable people and you know that it's illogical that even these words were uttered.' " (*Id.* at p. 943, fn. 5.)

In light of this argument, the court in *Beltran* held "it was not reasonably probable that any possible ambiguity engendered by counsel's argument misled the jury. . . . [¶] . . . [T]he *Watson* test for harmless error 'focuses not on what a reasonable jury could do, but what such a jury is likely to have done in the absence of the error under consideration. In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so comparatively weak, that there is no reasonable probability the error of which the defendant complains affected the result.' [Citations] . . . [¶] . . . [¶] . . . Given the strong evidence supporting defendant's murder

13

conviction and the comparatively weak evidence of any legally adequate provocation, a different result was not reasonably probable." (*Beltran*, *supra*, 56 Cal.4th at pp. 956–957.)

Likewise, the prosecutor's improper argument in *Najera* did not lead to reversal of the murder conviction. Although the defense failed to object to the misstatements, the defendant was not prejudiced by the omission there because the evidence did not justify a heat of passion manslaughter instruction. " ' "A provocation of slight and trifling character, such as words of reproach, however grievous they may be, or gestures, or an assault, or even a blow is not recognized as sufficient to arouse, in a reasonable man, such passion as reduces an unlawful killing with a deadly weapon to manslaughter." ' " (*Najera*, *supra*, 138 Cal.App.4th at p. 226.) Calling Najera a "faggot" "would not drive any ordinary person to act rashly or without due deliberation and reflection" (*ibid*), and neither would pushing him to the ground and fighting with him (*id.* at p. 226, fn. 2).

In support of its conclusion, the *Najera* court cited *People v. Manriquez* (2005) 37 Cal.4th 547 (*Manriquez*). In *Manriquez*, a witness testified that the defendant called the victim a " 'mother fucker,' " and, similar to what Phan did here, "taunted" the defendant by "repeatedly asserting that if [he] had a weapon, he should take it out and use it." (*Id.* at p. 586.) Since this provocation was "plainly . . . insufficient to cause an average person to become so inflamed as to lose reason and judgment," the court did not err in denying the defendant's request for an instruction on heat-of-passion voluntary manslaughter. (*Ibid.*)

The evidence of provocation in Yim's case was weaker than in *Najera* and not materially different from *Manriquez*. Phan did not push Yim to the ground and punch him like the victim did to the defendant in *Najera*. Phan called Yim names, taunted him about his father, and taunted him once to get a gun. The victim in *Manriquez* also called the defendant a name and repeatedly taunted him to get a gun. Thus, it is questionable, just as in *Manriquez*, whether Yim was entitled to an instruction on heat-of-passion manslaughter.

14

Here, the jury was instructed on heat-of-passion, and in light of the record as a whole, the prosecution's argument caused no conceivable prejudice. Given the weak evidence of provocation it is not surprising that the defense made little effort to argue the heat-of-passion theory. On the other hand, the evidence supporting murder was strong. Yim killed Phan with multiple shots from an assault rifle, ending with an execution-style shot through his head at very close range. Park gave a clear account of the events preceding the killing, which was corroborated to a significant extent by Yim's testimony. Yim fled the area and confessed to his sister and cousin the next day that he had done something terrible. "Given the strong evidence supporting [Yim's] murder conviction and the comparatively weak evidence of any legally adequate provocation, a different result was not reasonably probable" absent the errors of which he complains. (*Beltran*, *supra*, 56 Cal.4th at p. 957.) Moreover, we must presume the jury followed the instruction to disregard counsel's explanation of the law if it conflicted with the court's instructions on heat of passion. (*Najera*, *supra*, 138 Cal.App.4th at p. 224.)

C.  Substantial Evidence

Yim contends that his first degree murder conviction was not supported by substantial evidence of premeditation and deliberation, and must therefore be reduced to second degree murder. His contention requires us to consider whether a reasonable trier of fact could find that the prosecution sustained its burden of proving Yim guilty beyond a reasonable doubt. (*People v. Johnson* (1980) 26 Cal.3d 557, 576.) In making that determination, we must view the evidence in the light most favorable to the verdict and presume in support of the judgment the existence of every fact the jury could reasonably deduce from the evidence. (*Ibid.*)

*People v. Anderson* (1968) 70 Cal.2d 15, 26–27 (*Anderson*) identified three categories of evidence relevant to premeditation and deliberation: (1) planning activity, (2) motive, and (3) the manner of killing. The *Anderson* court stated that first degree murder convictions are typically sustained "when there is evidence of all three types [or] at least extremely strong evidence of (1) or evidence of (2) in conjunction with either (1) or (3)." (*Id.* at p. 27.)

15

As for the first *Anderson* factor, Yim argues that his only planning activity before he shot Phan was arming himself, and that Park's testimony showed he was in a "fit of blind rage" when he did so. He contends that shooting Phan with a witness present, and neighbors nearby who were likely to hear the shots, showed the "lack of any preconceived design" on his part. As for the second factor, he had no "preexisting motive" to kill his friend Phan, and did so only in a "drunken rage." As for the third factor, while his "manner of killing Phan was extremely brutal, it was not so particular or exacting that a reasonable jury could conclude that it evinced a preconceived design." Yim contends that he cannot be found to have committed first degree murder under the *Anderson* framework because motive evidence did not support an inference of premeditation and deliberation, and evidence of planning activity was not "extremely strong."

However, the *Anderson* factors need not "be present in some special combination or . . . accorded a particular weight, nor is the list exhaustive. *Anderson* was simply intended to guide an appellate court's assessment whether the evidence supports an inference that the killing occurred as the result of preexisting reflection rather than unconsidered or rash impulse." (*People v. Pride* (1992) 3 Cal.4th 195, 247; see *People v. Houston* (2012) 54 Cal.4th 1186, 1216 [subsequent cases have confirmed that the *Anderson* factors are not exclusive, or invariably determinative].)

Yim makes what are in effect arguments weighing the facts that are unavailing on appeal. He contends that Park's testimony showed the killing occurred in "an extended fit of blind rage," but the evidence did not compel that conclusion. Park said that Yim appeared to calm down after he broke his TV screen. He sat with a blank expression, not a look of rage. Some 15 to 30 minutes later, Phan pushed Yim and told him to go get his gun. After this additional taunt, five more minutes elapsed before Yim got up and walked slowly through the kitchen. Yim testified that he retrieved the AR-15 from his bedroom and cocked it before returning to the living room. Park said that when Yim returned he was focused entirely on Phan, and at this point appeared to be in a "pent up rage." Yim had not converted the rifle to a fully-automatic, which meant that he had to

pull the trigger to fire each of his shots at Phan.  He shot Phan multiple times, hitting him twice in the torso and then killing him with a close-range shot to his head.

The manner of the killing and the circumstances preceding it provided substantial evidence that the murder was deliberate and premeditated.  In the context of first degree murder, "premeditated" means considered beforehand, and "deliberation" means careful thought and weighing of considerations for and against the proposed course of action. (*People v. Houston, supra,* 54 Cal.4th at p. 1216.)  Premeditation and deliberation do not require any extended period of time.  (*Ibid.*)  The test is the extent of the reflection, and cold, calculated judgment may be arrived at quickly.  (*Ibid.*)  The jury could reasonably find Yim had sufficient time to reflect and did reflect on what he would do to Phan after Phan taunted and pushed him.

D.  Sentencing Issue

Yim contends, the People concede, and we agree that the court erred when it imposed and stayed a three-year enhancement for infliction of great bodily injury (Pen. Code, § 12022.7, subd. (a)) to the sentence for mayhem, because infliction of great bodily injury is an element of that offense (Pen. Code, § 12022.7, subd. (g); see *People v. Santana* (2013) 56 Cal.4th 999, 1008).

### III.  DISPOSITION

The judgment is modified to strike the Penal Code section 12022.7, subdivision (a) enhancement to the sentence for mayhem.  As so modified, the judgment is affirmed. The trial court is directed to prepare and forward to the Department of Corrections and Rehabilitation an amended abstract of judgment reflecting the modification.

_____
Siggins, J.

We concur:

_____
Pollak, Acting P.J.

_____
Jenkins, J.

*People v. Yim*, A140694

18