Filed 5/10/13  P. v. Carlson CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>RICHARD LEROY CARLSON,<br><br>      Defendant and Appellant. | A131740<br><br>(Marin County<br>Super. Ct. No. SC169309A) |

Richard Leroy Carlson (defendant) appeals from a judgment upon a jury verdict finding him guilty of second degree murder (Pen. Code,[1] §187, subd. (a)); use of a deadly weapon in the commission of the offense (§ 12022, subd. (b)(1)); and infliction of great bodily injury upon the victim who was 60 years of age or older (§§1203.075, subd. (a)(1); 1203.09, subd. (b)(1)).  Defendant contends that his pretrial statements were admitted in violation of his Fifth Amendment right against self-incrimination; that the prosecutor committed misconduct by arguing the incorrect standard of provocation; and that introduction of evidence of his prior act of elder abuse violated his rights to due process. We affirm.

**FACTS**

On March 15, 2010, Eleanor Carlson (Carlson) was 72 years old.  She lived alone at her home at 215 C Street in San Rafael.  She had difficulty walking and used a cane. At about 4 a.m. on March 15, 2010, one of Carlson's neighbors heard a window being

---

[1] Unless otherwise indicated, all further statutory references are to the Penal Code.

shattered and an alarm go off.  Another neighbor heard Carlson scream around the same time.  The police responded to Carlson's home and found that the back window at the rear of the home was broken.  They also found broken glass on the deck and in the interior of the home as well as a shard of glass still intact on the window, suggesting that the window had been pushed inward. Upon investigation, the police found Carlson lying face down approximately 10 feet inside the home near the rear patio door.  There was a large amount of blood under her head.  She was pronounced dead at the scene.  The police found blood on the cabinets, in the sink, and on the floor in the hallway bathroom of Carlson's home.  Carlson suffered a series of wounds including a central, large gaping wound to her neck and her carotid arteries.  She also suffered several skin wounds, an abrasion under her chin, contusions or bruises on her knees and scrapes and bruises on her right hand.  The wounds likely resulted from multiple stabbing or sawing actions, with a knife moving back and forth.  The wounds were consistent with having been inflicted from behind while Carlson was face down on the floor.  The wounds to Carlson's neck caused her death.

Carlson's home had a burglar alarm system.  Information retrieved from the alarm panel reflected that the alarm was set at 6:45 p.m. on March 14, 2010.  At 3:49 a.m. on March 15, 2010, the alarm was triggered on an interior door to the basement of the home.  At 3:50 a.m., another alarm went off at the patio door, the rear door to the home.  Both alarms rang for five minutes each.

Donna Whitney, Carlson's friend and neighbor, testified that on January 19, 2010, Carlson called her and left a message.  Carlson was crying during the message and asked Whitney to call her when she got home.  Whitney immediately called her when she arrived home and then went across the street to Carlson's home.  Carlson was shaking and crying and told Whitney that defendant had been there around noon and that they had argued over money and childhood issues.  When he was at the front door and about to leave, he turned around and pushed her into the kitchen and onto the kitchen floor.  She could not get up on her own and eventually defendant helped her get off the floor.  Carlson walked to the living room and sat in a rocking chair.  Defendant followed her and

2

tipped the rocking chair backwards, put his hands around her neck and said, "I could kill you." Carlson replied, "[I]f you kill me, you can't get the money." Defendant responded, "I can go to jail and get the money later." At some point, he also yanked Carlson's wrist watch off her arm and threw it onto the living room floor.

Carlson reported the incident to the police on January 25, 2010. The police took photographs of the bruises on Carlson's left arm. On January 31, 2010, Carlson left money in an envelope for defendant on her porch, because she did not want to have any contact with him.

In February 2010, Carlson sought a restraining order against defendant because she was afraid of him. She also changed the locks on her home, and had the alarm system installed in late February.

Defendant was arrested for Carlson's murder on March 16, 2010. During the search incident to his arrest, the police found a Leatherman knife in the right front pocket of his pants. The knife had blood stains on it. The police also searched a backpack which defendant was carrying. In the backpack, the police found clothing including a pair of jeans that appeared to have a blood stain on the knee areas. The backpack also contained a laptop, a Golden Gate Transit Guide, a rope, and some wires.

A forensic examination of the laptop revealed that defendant had accessed the Web site, fugitive.com, on the afternoon of March 16, 2010, and had found a webpage that read, "Eleanor Carlson identified as woman murdered in her San Rafael home."

DNA analysis of the blood evidence found on the knife and on defendant's sweatshirt matched Carlson's. On defendant's jeans, analysis of the blood matched the DNA profiles of both Carlson and defendant.

Defendant testified that he grew up with his adoptive parents, Carlson and Richard Carlson, Sr. Carlson, Sr. died when defendant was nine or ten years old, and thereafter Carlson began drinking heavily and would abuse him both verbally and physically. He also stated that Carlson fondled him when she bathed him and in her bedroom. The fondling lasted about a year, after which defendant told her to stop. In his early teen years, he moved to a group home.

3

Defendant testified that, on the evening of March 14, 2010, he went to visit Carlson because he had not heard from her in over a month. He arrived at Carlson's home shortly after midnight. He saw that the living room lights were still on so he walked up to the patio deck and knocked on the patio door. Carlson let him in the house. They argued for about three hours; defendant believed that Carlson had withheld information from him. He pushed Carlson, and the argument continued. Carlson told him that he was not a part of the family, and pushed him, telling him to get out of her way. Defendant responded by pushing her onto the floor. He was upset and hurt by her treatment of him his entire life, and told her, "You'll never touch me again." Carlson fell face first. Defendant took out his Leatherman knife, climbed behind Carlson and started to slash her neck. He stabbed her in the neck several times. He admitted that he killed her, but testified that he did not plan to kill her.

He cried and went to the bathroom where he washed his hands. He was furious with himself and grabbed a board from the dining area and smashed the window in the living room. He tried to calm himself down and decided to go to the basement, but when he opened the door to the basement, the alarm sounded. He got scared, went back up the stairs and left the house through the patio door. He threw out his sweater in a garbage can on a side street off of C Street and changed his pants when he got to the bus stop. He caught a bus to El Cerrito.

Prior to his arrest, defendant tried to arrange a surrender with the public defender's office. He was upset that the police used a ruse to get him to go to the Hayward BART station where he was arrested.

4

**DISCUSSION**

*1. Miranda[2]*

Defendant contends that his pre-*Miranda* statements were admitted in violation of his Fifth Amendment right against self-incrimination.[3] We conclude that the statements were spontaneous and that there was no *Miranda* violation.

Detective Phillip Melodia questioned defendant upon his arrest. The following exchange occurred[4]: "[MELODIA]: . . . So that chair right in front of you is gonna be your chair. [¶] [DEFENDANT]: Okay. [¶] [MELODIA]: So the door's not locked. It's just closed for privacy purposes. I don't want to give you the impression that we're locking you in here. [¶] [ DEFENDANT]: Alright. [¶] [MELODIA]: So. We just need to get some very basic information. Um, your first name's Richard, is that correct? [¶] [DEFENDANT]: That's correct. [¶] [MELODIA]: Um, what's your last name, Richard? [¶] [DEFENDANT]: Carlson. [¶] [MELODIA]: And date of birth, sir? [¶] [DEFENDANT]: October sixth, nineteen seventy-nine . . . ." Melodia then asked defendant for his astrological sign and elicited a couple of responses from defendant about astrology and continued with a question asking for defendant's address in Oakland. Defendant responded: "Uh, yeah. Um, before we go too much further. I have a couple questions I have to ask. [¶] [MELODIA]: Sure. [¶] [DEFENDANT]: Um. I have no problem talking with you guys. I understand questions are to be asked. I spoke with some legal representation. They asked me to speak with them first. [¶] [MELODIA]: Okay. [¶] [DEFENDANT]: I simply wanna hold to that. [¶] [MELODIA]: Okay. So, here's the, I'm just gonna get some basic biologic, uh, biographical information and then, um before I, before either one of us get into any questions why you're here, we would be

---

[2] *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

[3] In his opening brief, defendant contended that his counsel was ineffective because he failed to raise a Fifth Amendment objection to the admission of the statements in the trial court. Defendant acknowledges in his supplemental opening brief that his trial counsel did make the appropriate Fifth Amendment objection below.

[4] The jury viewed a videotape of the interview.

first required to read you your rights. And, and, we'll, we'll do that and at, at that point when we read you your rights, if, if you wanna talk to us, you can talk to us. If you don't wanna talk to us, you don't have to talk to us. We're not _____ guys. We're not gonna force you to say anything that you, you don't wanna say. So . . . [¶] [DEFENDANT]: I have one other serious question. [¶] [MELODIA]: Okay. [¶] [DEFENDANT]: So far everyone informed me that there was an issue and that I needed to contact San _____, San Rafael Police Department. Except for the San Rafael Police Department. Why was no one here? Why did no one here try to contact me directly? [¶] [MELODIA]: Okay, so I, I would love to share with you the, the lengths that we went to in order to contact you, and, you know, and I, I will. And I'll be happy to share that with you. [¶] [DEFENDANT]: Please. [¶] [MELODIA] Um. But, Um. [¶] [DEFENDANT]: You have my phone number. [¶] [MELODIA]: We did, and, and that was, um, that was kinda our, our last ditch effort. [¶] [DEFENDANT]: My phone number was never called. [¶] [MELODIA]: You're right. We, the San Rafael Police Department, never called your, your cell phone, your phone number. [¶] [DEFENDANT]: So, why go to the extent that you have to try to con, to try to track me down without actually knocking on my door per se and contacting me? [¶] [MELODIA]: The problem with phone conversation is we have, it's yes, we, we knew what your phone number was but we have a hard time identifying who the other person on the phone that we're speaking to. We'd much rather have conversations face-to-face. [¶] [DEFENDANT]: Then why not call me and arrange a face-to-face conversation? [¶] [MELODIA]: That was, at, that absolutely was an option and that was somethin' that we were gonna have to do if we couldn't find you at some of your last-known addresses, so. That's. [¶] [DEFENDANT]: I got taken down today because you guys didn't make a phone call. I'm not in the happiest mood. [¶][MELODIA]: Okay. I, I, I'll, I'll apologize for. [¶] [DEFENDANT]: While I was contacting my public defender, waiting to hear from him for a surrender. [¶] [MELODIA]: Okay. Hey, and if you were in contact with, with an attorney and you were, uh, negotiating some kind of surrender to us, that, that's fine. I, I appreciate you goin' out and, and said hey, I

6

understand that the police _____ are lookin' for me. But, you know. We wanted a face-to-face meeting. . . . [S]o we were exhausting all the resources in regards to last-known addresses and people that you know so that we can have this conversation face-to-face. And I apologize for, for any manner in which . . . you were taken into custody. [¶] [DEFENDANT]: You have taken my girlfriend's cell phone and computer. You have harassed my friends and you have posted something on the media where you were not one hundred percent that I was a suspect but decided that everyone should see my face. You have done everything but try to contact me. [¶] [MELODIA]: Okay. Richard . . . [¶] [DEFENDANT]: I. I have nothing more to say about that. I am offended at minimum."

Defendant moved in limine to exclude evidence that he had invoked his Fifth and Sixth Amendment rights. The court granted the motion to exclude evidence of defendant's invocation of his *Miranda* rights, but the issue of whether defendant's other statements were relevant evidence was left open pending the court's view of the videotape. The prosecutor argued that defendant's statements were relevant to show his demeanor shortly after the incident. The court preliminarily ruled that defendant's statements were admissible as spontaneous statements made prior to the *Miranda* advisements, and that they were relevant and probative as to the cause of his injuries, his state of mind, and his demeanor.

The court revisited the issue, upon the prosecutor's in limine motion to admit the statements defendant made prior to the *Miranda* admonition. The prosecutor argued that any questioning by Detective Melodia was "an attempt to obtain biographical information" and that defendant's statements were spontaneous. The court granted the motion, finding that the statements were admissible under Evidence Code section 352.

The court again addressed the issue when the prosecutor alerted the court that the transcript of the videotape had earlier mistakenly transcribed the statement defendant made after telling Melodia that he had spoken with the public defender as "I simply won't hold to that." Defendant actually said, "I simply want to hold to that." Defense counsel renewed its objection to the admission of the statements, arguing, "We are still

7

objecting, and even more based on the clarification of his invocation of *Miranda*. . . ." The court indicated that it would review the motion before opening statements.

Upon review, the court restated its prior order, ruling that defendant's statements were admissible. The statements were very clearly spontaneous statements and discussions initiated by the defendant and his questioning.

In *Miranda*, the United States Supreme Court held that the Fifth Amendment right against self-incrimination prohibits the prosecution from using statements obtained during custodial interrogation unless it demonstrates the use of procedural safeguards to secure the suspect's privilege against self-incrimination. (*Miranda, supra,* 384 U.S. at p. 444.) Thus, before a suspect is subjected to custodial interrogation, the police must warn him or her "that he has the right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently." (*Miranda, supra,* 384 U.S. at p. 444.) The purpose of the *Miranda* warnings is to reduce the risk of coerced confessions and safeguard the Fifth Amendment right against self-incrimination. (*Id.* at p. 444; *Arizona v. Mauro* (1987) 481 U.S. 520, 530.)

The United States Supreme Court has recognized a " 'booking exception' " to the *Miranda* requirements. (See *Pennsylvania v. Muniz* (1990) 496 U.S. 582, 601–602, fn. 14.) Under the booking exception, routine questions seeking " ' "biographical data necessary to complete booking or pretrial services" ' " are exempt from *Miranda*. (*Id.* at p. 601.) The police, however, may not ask questions during the booking process that are "designed to elicit incriminatory admissions." (*Id.* at p. 602, fn. 14.)

Here, defendant argues that Detective Melodia continued to interrogate him, under the guise that his questioning was related to booking, despite his clear invocation of his right to counsel. The record belies this argument.

Defendant invoked his right to counsel by indicating to Melodia that he would "hold to [his counsel's advice]" "to speak with them first," in response to Melodia's request for defendant's address. Melodia then stated that he was going to get some

8

biographical information before reading defendant his *Miranda* rights, but before Melodia could do so, defendant proceeded to complain about the process which resulted in his arrest.

Hence, the statements defendant sought to exclude from evidence were not made in response to any booking questions by Melodia, but were volunteered before Melodia could continue with a follow-up question to his request for defendant's address. On this record, the trial court correctly ruled that defendant's statements were spontaneous; they were not the product of a *Miranda* violation nor were they in response to a question by Melodia designed to elicit an incriminating admission.

"[V]olunteered statements not the product of interrogation are admissible." (*People v. Edwards* (1991) 54 Cal.3d 787, 815.) Here, Detective Melodia, following the question seeking defendant's address, did not ask any further questions during defendant's statements, he merely listened and responded briefly to defendant's inquiries regarding why the police did not call him before arresting him. There was simply no interrogation by Detective Melodia following defendant's invocation of his *Miranda* rights. (See *Rhode Island v. Innis* (1980) 446 U.S. 291, 300–301 [interrogation refers to express questioning and "any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response[] from the suspect."] Thus, no *Miranda* violation occurred.

Defendant's argument that his subsequent statements made after his *Miranda* invocation were involuntary and inadmissible is unavailing. *People v. Neal* (2003) 31 Cal.4th 63, cited by defendant is inapposite. There, after the defendant invoked his right to counsel, the police pressed on with the initial interrogation despite defendant repeatedly invoking his right to counsel. (*Id.* at p. 73.) The police then both promised a better result and threatened a heavier charge if the defendant chose not to cooperate. (*Id.* at p. 81.) The defendant subsequently confessed in second and third interviews. (*Ibid.*) The court held that the confessions were involuntary and inadmissible, noting that promises and threats are recognized as corrosive of voluntariness. (*Id.* at pp. 84–85.)

9

Here, the record clearly demonstrates that Detective Melodia did not continue the interrogation after defendant invoked his right to counsel. While he did indicate to defendant that he was going to ask for some biographical data after defendant invoked his right to counsel, before he could proceed with any of those questions, defendant interjected with his own question. He then proceeded to complain about how he was taken into custody. Defendant's statements were spontaneous and not in response to "interrogation." In light of our conclusion that defendant's statements were made voluntarily, we need not reach the question of prejudice.

## 2. *Prosecutorial Misconduct*

Defendant next contends that he was denied due process because the prosecutor erred in his comments on provocation in his closing argument. Alternatively, he argues, that the prosecutor's argument constituted misconduct.

In arguing that defendant had not proven sufficient provocation to defeat a first degree murder conviction, the prosecutor urged: "Would a person of average disposition in the same situation, knowing the same facts, react in the same way that he did, essentially? What would the reaction be by an objective, reasonable person, knowing this history here, to be pushed by a 72-year-old frail woman, needs help with her groceries, cannot walk very well without the assistance of a cane, this person who was pushed did not lose his balance, he just took a step, regained his balance, what should happen next in an objectively reasonable standard? [¶] This is so he can have a manslaughter conviction. I'm not saying this happened, but I'm saying, *this is what he has to prove to get to that*. Is the reasonable reaction to push her down so that she falls sideways and face forward, remove a weapon from your pocket while she's defenseless on the ground, and extend the blade, push her down, get on top of her and execute her? No." Defendant did not object to the prosecutor's argument. The court, however, did admonish the jury to disregard the prosecutor's argument that suggested defendant had to prove provocation. The court corrected the prosecutor's misstatement, admonishing the jury that the People had the burden of proving that the defendant did not kill as a result of a sudden quarrel or heat of passion.

10

Even if we were to conclude that the prosecutor's argument constituted misconduct, it is not reasonably likely that the jury applied the prosecutor's comments in an improper or erroneous manner given the record as a whole. (See *People v. Brown* (2003) 31 Cal.4th 518, 553.) First, we note that the prosecutor prefaced his remarks with a correct statement on the effect of provocation to reduce murder to voluntary manslaughter: "The provocation would cause a person of average disposition to act rashly and without due deliberation." (See CALCRIM No. 570.) Second, the trial court correctly instructed the jury. The court instructed the jury on voluntary manslaughter based on a killing in the heat of passion (CALCRIM No. 570) and on the effect of provocation on the degree of murder (CALCRIM No. 522).[5] Finally, in response to inquiries from the jury during deliberations,[6] the court had yet another opportunity to reiterate its instructions on first degree and second degree murder and to explain the effect of provocation. Hence, the record reflects that the court explained to the jury the manner in which the definition of provocation fit within the instructions, including the following: "Provocation is not an element of either of these [first or second degree murder]. Provocation is a factor that may be considered in deciding whether these elements have been proven. So if we look at, in [CALCRIM No.] 522, provocation may reduce a murder from first to second degree and may reduce a murder to manslaughter. [¶] The weight and significance of the provocation, if any, are for you to decide. If you conclude that the defendant committed murder, but was provoked, consider the provocation in deciding whether the crime was first or second degree murder. In other words, when you are looking at [CALCRIM No.] 521 [first degree murder], deliberate, premeditated, willful intent to kill, you may consider that factor of provocation in deciding whether the People have proven first degree murder under [CALCRIM No.]

---

[5] The issue of whether former CALCRIM No. 570 correctly states the provocation and heat of passion standard as a basis for a conviction of voluntary manslaughter is currently before the Supreme Court in *People v. Beltran*, S192644, review granted, May 6, 2011.

[6] The jury asked "Is Murder 1: pre-meditated deliberate [and] with intent to kill and Murder 2: pre-meditated intent to kill deliberate [and] with provocation."

11

521. [¶]  You may also consider provocation when you are looking at whether or not the defendant has been proven guilty beyond a reasonable doubt of voluntary manslaughter, which is found in [CALCRIM No.] 570. . . .”

The jury submitted another question during deliberations asking whether it could use the same definition of provocation when considering reducing first degree murder to second degree murder.  After receiving clarification from the jury as to which “definition” it was referring to in its question and determining that the jury had found the term, provocation, in both CALCRIM Nos. 522 and 570, the court further instructed the jury as follows:  “Provocation, the term, itself, is not defined in the instructions.  So under those circumstances, of course, you use the ordinary everyday meaning of the term ‘provocation.’  [¶] What is described in instruction 570 is the effect of provocation, if you find any provocation on a finding of manslaughter versus murder.  In other words, how provocation might tie into your finding about whether or not a crime committed was murder versus manslaughter.  [¶] [CALCRIM No.] 570 has some specific guidelines, obviously, with regard to the effect of provocation on a finding of manslaughter, and you see the elements there that are pretty detailed.  Those elements and that definition of the effect of provocation is not the same that you apply in examining whether a crime is first or second degree murder.  [¶] If you look at the preceding instruction in the first paragraph, it states, ‘Provocation may reduce a murder from first degree to second degree and may reduce a murder to manslaughter.’  [¶] Here, it says, ‘The weight and significance of the provocation, if any, are for you to decide.’  So that’s the only detailed instruction that you are given in terms of the effect of provocation on a finding of the degree of murder.  [¶] It’s much more specific in 570 as to the effect of provocation on a finding of manslaughter in 570.  So the short answer to your question is, 570 does not apply to a finding of the degree of murder.  570 is specific to how provocation might affect a finding of sudden quarrel or heat of passion.”

Given the court’s instructions, it is not reasonably probable that the jury was misled by any misconduct during the prosecutor’s argument.  We must presume that the jury understood and correlated all of the instructions given to it.  (*People v. Najera*

(2006) 138 Cal.App.4th 212, 224; *People v. Martin* (2000) 78 Cal.App.4th 1107, 1111.) To the extent defendant argues that CALCRIM No. 570 was insufficient because it did not prevent the jury from "also requiring, as the prosecutor argued, that the provocation must cause the person of average disposition to take the same actions as" defendant, it was his responsibility to request a clarification or modification of the instruction at trial. " 'If defendant believed that the instruction was incomplete or needed elaboration, it was his responsibility to request an additional or clarifying instruction.' " (*People v. Carpenter* (1997) 15 Cal.4th 312, 391.)

By convicting defendant of second degree murder, the jury rejected the defense that defendant acted with sufficient provocation when he killed Carlson. (See *People v. Manriquez* (2005) 37 Cal.4th 547, 564, 583–584 [evidence that victim insulted the defendant and his mother and taunted the defendant to take out his pistol and use it was insufficient provocation to "cause an ordinary person of average disposition to act rashly or without due deliberation and reflection"].) Here, the overwhelming evidence, which included defendant's admission that he killed Carlson, supports the jury's finding. It is not reasonably probable that had counsel objected to the prosecutor's argument, the jury would have reached a different verdict. (*Strickland v. Washington* (1984) 466 U.S. 668, 694.)

### 3. *Propensity Evidence*

Finally, defendant contends that the trial court erred by permitting evidence of his prior act of elder abuse against Carlson. Over defendant's objection, the court permitted the evidence of the January 19, 2010 incident for the purpose of showing defendant's propensity to commit violence and establishing his character. The jury was instructed pursuant to CALCRIM No. 852 that if it decided that defendant committed the prior incident of elder abuse, it may "conclude from that evidence that the defendant was disposed or inclined to commit domestic violence or elder abuse; and based on that decision, also conclude that the defendant was likely to commit, and did commit, the charged offense."

13

Defendant argues that admission of the propensity evidence under Evidence Code section 1109 violated his due process rights.  He acknowledges that our Supreme Court rejected due process challenges to Evidence Code section 1108, a parallel provision to Evidence Code section 1109 in *People v. Falsetta* (1999) 21 Cal.4th 903, 917 and *People v. Reliford* (2003) 29 Cal.4th 1007, 1012–1016, but raises the issue to preserve the claim for federal court review.  We are bound by our Supreme Court's ruling on the issue.  (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)  We note that California appellate courts have rejected due process challenges to Evidence Code section 1109, relying on *Falsetta.*  (See *People v. Cabrera* (2007) 152 Cal.App.4th 695, 704, and cases cited therein.)

Defendant also argues that CALCRIM No. 852's instruction on propensity evidence lightened the prosecution's burden of proof and thus violated his due process rights.  In *People v. Reliford, supra,* 29 Cal.4th at pp. 1012–1016, the court rejected the defendant's challenge to CALJIC No. 2.50.01, the analogous instruction on propensity evidence of uncharged prior sex crimes.  The *Reliford* court disagreed with the defendant's argument, holding that it was not "reasonably likely a jury could interpret the instructions to authorize conviction of the charged offenses based on a lowered standard of proof." (*Id.* at p. 1016.)  We follow *Reliford* and conclude that CALCRIM No. 852 does not offend due process.  (See also *People v. Reyes* (2008) 160 Cal.App.4th 246, 251–253 [holding that CALCRIM No. 852 does not violate a defendant's due process rights].)

Finally, defendant argues that admission of the January 19, 2010 incident and evidence of Carlson's fear of him violated Evidence Code section 352.  The trial court balanced the probative value of the evidence against its prejudicial effect and ruled that it was not unduly prejudicial, and that under Evidence Code section 352, the probative value of the evidence outweighed its potential prejudice.

We agree with the trial court's ruling.  "[I]n enacting Evidence Code section 1109, the Legislature found that in domestic violence cases evidence of prior acts is particularly probative in demonstrating the propensity of the defendant."  (*People v. Cabrera, supra,*

14

152 Cal.App.4th at p. 705.) Here, the evidence was relevant to Carlson's state of mind during the period from the January 19th incident until the murder two months later, and Carlson's escalating fear of defendant. As the Attorney General points out, the evidence of the prior incident and its temporal proximity to the murder and the manner of the attacks in both instances were highly probative and tended to disprove defendant's theory that he acted in the heat of passion when he killed Carlson. The evidence of the prior incident and Carlson's fear was not unduly cumulative or excessive. Indeed, the court limited the number of witnesses, and the testimony of those who did testify was brief. In sum, the trial court did not abuse its discretion in finding that the probative value of the evidence outweighed any potential prejudice. (*People v. Ewoldt* (1994) 7 Cal.4th 380, 404.)

In light of our disposition of the issues, we need not reach defendant's contention that he was prejudiced by cumulative error.

## DISPOSITION

The judgment is affirmed.


_____
Rivera, J.


We concur:

_____
Reardon, Acting P.J.


_____
Humes, J.