Filed 11/15/24  P. v. Espinoza CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FOURTH APPELLATE DISTRICT

# DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E082374 |
| v. | (Super.Ct.No. FVI21000082) |
| ANDREW MANUEL ESPINOZA, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  John P. Vander Feer, Judge.  Affirmed.

Michael C. Sampson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Assistant Attorney General, A. Natasha Cortina and Kelley Johnson, Deputy Attorneys General, for Plaintiff and Respondent.

1

A jury convicted Andrew Manuel Espinoza of second degree murder for the killing of the new romantic partner of someone Espinoza had dated. On appeal, Espinoza argues that his trial counsel rendered ineffective assistance by failing to object to the prosecutor's misstatements in closing argument concerning the law of provocation. We find no prejudice and affirm.

BACKGROUND

I.    *The charges*

Espinoza was charged by information with first degree murder for the January 7, 2021, killing of Christian Ruiz. (Pen. Code, § 187, subd. (a); unlabeled statutory references are to this code.) The information also alleged that (1) the offense was a serious felony (§§ 667.5, subd. (c), 1192.7, subd. (c)), (2) Espinoza personally used and discharged a firearm (§ 12022.53, subds. (a)-(c)), and (3) he intentionally discharged a firearm that proximately caused great bodily injury or death (§ 12022.53, subd. (d)).

II.    *The trial*

At trial, 12 witnesses testified for the prosecution, and no witnesses testified for the defense.

A.    *The relationships*

Samantha G. testified that she and Espinoza dated for approximately one year. She said that she ended the relationship a few months before January 2021. Espinoza's sister, Christina B., testified that Espinoza and Samantha were dating in January 2021 and that the relationship seemed fine. But Christina spoke with a detective on January 7, 2021, and described Samantha as Espinoza's ex-girlfriend. Christina testified that she

2

heard "[a] couple days before" Ruiz was killed that Samantha and Ruiz were "messing around."

Samantha sometimes stayed in a camper that she parked at Lester G.'s house. Lester lived several houses away from Espinoza, around the corner and on a different block. Espinoza lived with various family members, including Christina and Randolph D., Christina's boyfriend. Lester and Espinoza were good friends. Lester described Espinoza as a jealous person.

Samantha said that she and Ruiz were involved in a sexual relationship, which started about one week before January 7, 2021. Espinoza and Ruiz were friends. According to Samantha, Ruiz previously dated Christina. Samantha stated that Espinoza knew that she was dating Ruiz, but Espinoza had never seen Samantha and Ruiz together.

B. *The week before the killing*

Samantha testified that on either New Year's eve or New Year's day 2021 Espinoza took her to a casino against her will. At the casino, Samantha called Ruiz, who picked her up. Espinoza and Ruiz got into "a heated argument." Espinoza was "mad." Christina told a detective that at some point Espinoza spoke with Ruiz and asked him, "'What's going on with you and my girl?'" Espinoza and Ruiz were not on cordial terms after the argument at the casino. Samantha left the casino with Ruiz.

Samantha testified that in January 2021 Espinoza confronted her numerous times about her dating Ruiz. She described the confrontations as being heated. Espinoza told Samantha that because of his friendship with Ruiz it was disrespectful for her to date Ruiz.

3

C. *The killing*

On January 7, 2021, Samantha invited Ruiz over to her camper, but she fell asleep before he arrived. Samantha drank alcohol before she fell asleep, but she said that she was not drunk. She also had smoked methamphetamine earlier that day. A detective who interviewed Samantha that night said that she did not appear to be under the influence.

Randolph went to Lester's house that night but returned home when Lester did not answer the door. Randolph testified at trial, but he could not recall any other details about that night. Detectives interviewed Randolph in February 2021 about what happened on January 7. Portions of the interview were played for the jury, and a transcript was admitted into evidence.

When Randolph was at Lester's, he noticed that Ruiz's truck was parked at Lester's house. When Randolph returned home, Espinoza was outside working on a car, and Christina was also home. Randolph told Espinoza that Ruiz's truck was parked at Lester's. Espinoza responded by saying, "what the fuck" and "nah, fuck that." According to Randolph, Espinoza then took off in his car, "probably . . . faster than usual." Randolph did not realize that there was any issue between Espinoza and Ruiz. Randolph told law enforcement that Christina panicked when Espinoza took off. Christina told Randolph, "[G]o get that fool, like what the fuck, like . . . he's gonna do something stupid." (Ellipsis in original.) Christina disputed that account. Randolph drove to Lester's and pulled up to the house right after Espinoza.

4

Randolph said that Espinoza went "straight to the trailer, and either . . . rip[ped] open the door or not." (Ellipsis in original.) After Espinoza entered the trailer, it was "shaking and shit" from what Randolph described as "commotion." Randolph then heard a gunshot.

Samantha testified that she was awoken by a gunshot, and she immediately sat up in bed. According to Samantha, Ruiz was approximately three or four feet in front of her, with his back toward her. Espinoza was standing in front of Ruiz and facing Samantha. The two men were "kind of wrestling." It appeared to Samantha that Ruiz "was trying to take the gun from [Espinoza] or hold it." Samantha heard Ruiz say, "'No.'" Samantha then heard another gunshot. Espinoza left the camper, and Ruiz fell forward onto his hands and knees.

Randolph recounted what happened differently. He told law enforcement officers that after he heard the initial gunshot he leaned inside the camper's door and saw Ruiz sitting on the edge of the bed, where he was rocking back and forth and saying "oh, fuck, oh, fuck." Randolph did not know if Espinoza "was saying something or yelling or what."

Espinoza was standing over Ruiz and hit Ruiz "[o]verhead" while Ruiz was seated and "rocking." Randolph could not tell whether Espinoza had anything in his hand, because it was dark and the lights in the trailer were off. Randolph did not see a gun. Asked what happened after Espinoza hit Ruiz, Randolph responded, "I don't know, out of it. [inaudible] whatever. A shot [inaudible] maybe, it went off again or something, I don't know." He then confirmed that "a gun went off."

5

After Espinoza exited the camper, Samantha heard a vehicle leave. Lester "heard a couple of pops" from inside the house and went to the camper. Samantha appeared scared, and Ruiz was on his knees and moaning. Samantha called 911. The paramedics arrived shortly thereafter.

Ruiz suffered two gunshot wounds, one on his lower abdomen and one on his upper back. Ruiz died as a result of the gunshot wound to his abdomen.

III.     *The instructions, closing argument, and deliberations*

The jury was instructed on first degree murder, second degree murder, self-defense, and voluntary manslaughter based on both heat of passion and imperfect self-defense. The court used CALCRIM No. 520 to instruct the jury on first and second degree murder with malice aforethought. After describing the elements of murder and express and implied malice, the instruction stated: "If you find the defendant guilty of murder, it is murder of the second-degree."[1]

---

[1]     CALCRIM No. 520 provides the following guidance: "*<Give the following bracketed paragraph if the second degree is the only possible degree of the crime for which the jury may return a verdict>* [¶] [If you find the defendant guilty of murder, it is murder of the second degree.] [¶] *<Give the following bracketed paragraph if there is substantial evidence of first degree murder>* [¶] [If you decide that the defendant committed murder, it is murder of the second degree, unless the People have proved beyond a reasonable doubt that it is murder of the first degree as defined in CALCRIM No. __<insert number of appropriate first degree murder instruction>.]" The jury was given verdict forms for first degree and second degree murder and was otherwise instructed on first degree murder liability, so it appears that the court mistakenly instructed the jury with the first bracketed paragraph in CALCRIM No. 520 rather than the second. The error favored Espinoza by prohibiting the jury from convicting him of first degree murder.

With respect to heat-of-passion voluntary manslaughter, the court instructed the jury with CALCRIM No. 570, instructing that "[a] killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion." The court instructed the jury that it could find that Ruiz killed in the heat of passion if: (1) He "was provoked;" (2) "As a result of the provocation, [Espinoza] acted rashly and under the influence of intense emotion that obscured his reasoning or judgment;" and (3) "The provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment." The jury was further instructed: "In deciding whether the provocation was sufficient, consider whether a person of average disposition, in the same situation and knowing the same facts, would have reacted from passion rather than from judgment."

In closing argument, the prosecutor primarily argued that Espinoza was guilty of first degree murder because the evidence proved beyond a reasonable doubt that he killed Ruiz with malice and acted willfully and with premeditation and deliberation. Nevertheless, with respect to voluntary manslaughter, the prosecutor reiterated that the instruction given allowed the jury to find Espinoza guilty of voluntary manslaughter if it found that Espinoza "killed Christian because of a sudden quarrel or in the heat of passion." The prosecutor recounted the elements of heat of passion in the instruction as given. She also stated: "The same provocation, whatever provoked the defendant, that same provocation would have caused the person of average disposition to react the same way." The prosecutor informed the jury that it had to consider the sufficiency of the

7

provocation and commented: "So, what is sufficient provocation? Whether or not somebody of an average disposition in the defendant's position, knowing the same things, placed in the same spot, would have reacted the same say he did."

In discussing whether Espinoza was sufficiently provoked, the prosecutor described the circumstances leading to the killing as (1) Espinoza knew for seven days that his former girlfriend was romantically involved with Ruiz, (2) Ruiz was a friend of Espinoza's, (3) Espinoza already expressed his displeasure about the relationship to Ruiz, and (4) Espinoza did not see Samantha and Ruiz together. After describing those circumstances, the prosecutor continued: "This is a person who has known all of these things, and is put in a same position as the defendant. *What would that person of average disposition have done? And I will tell you, he would not have killed someone, right*? [¶] Maybe he would have gone over to fight." (Italics added.) The prosecutor further explained: "A person knowing all these things, who's already been separated from his ex-girlfriend, who has already known for some length of time that ex-girlfriend was dating someone new, was confronted with the new boyfriend and talked to him about it. Knowing all these facts, not like he just discovered them hanging out, not like he just discovered that, you know, he was being cheated on or something. He has known this for a period of time. *A person of average disposition would not have killed the new boyfriend.*" (Italics added.)

Defense counsel argued primarily that the prosecution had not proved beyond a reasonable doubt that Ruiz was the shooter. Defense counsel urged that Samantha was

8

not credible and that Randolph could have been the shooter, firing a gun to protect Espinoza from Ruiz.

Defense counsel argued in the alternative that if the jury believed the version of events in which Espinoza was the shooter, then the evidence supported heat of passion and provocation, noting that "seeing your girlfriend with another man is the oldest provocation of all time." Defense counsel further argued that if the jury did not believe that Espinoza was provoked, then the jury should "look at all the facts that the People themselves elicited about how angry he was. About how the houses were so close together. That he was enraged when he heard that Mr. Ruiz was there, and got in the car and drove there. The[ir] version of events, ladies and gentleman, lays out everything you need for provocation and heat of passion."

In rebuttal, the prosecutor remarked: "And I'm not saying that anyone shouldn't be angry that somebody else is dating your ex. Those are very human, normal emotions. But are we just going to go around saying it's okay to kill a person that your ex is sleeping with? Whether you known him seven days or seven years, the fact of the matter is that *this is not what an average person, a person of average disposition would do. We do not go around having known that our ex-girlfriend or ex-boyfriend is seeing someone new, and we just go and kill that person. We do not decide to do that.*" (Italics added.)

During deliberations, the jury asked one question: "Clarification on voluntary manslaughter. Basically item 3 as to 'a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgement.'" The court

9

answered:  "Words and phrases not specifically defined in these instructions are to be applied using their ordinary, everyday meanings.  See [CALCRIM No.] 200."

IV.    *The verdict and sentencing*

The jury found Espinoza guilty of second degree murder and not guilty of first degree murder.  The jury also found true all of the firearm enhancement allegations.  The trial court sentenced Espinoza to an aggregate term of 40 years to life in state prison.

DISCUSSION

Espinoza contends that his trial counsel rendered ineffective assistance by not objecting to the prosecutor's misstatements on the law of provocation.  We are not persuaded.

Manslaughter is "the unlawful killing of a human being without malice."  (§ 192.) A defendant lacks malice and is guilty of voluntary manslaughter in "limited, explicitly defined circumstances," including "'when the defendant acts in a "sudden quarrel or heat of passion" (§ 192, subd. (a)).'"  (*People v. Lasko* (2000) 23 Cal.4th 101, 108.)  Heat of passion "is a state of mind caused by legally sufficient provocation that causes a person to act, not out of rational thought but out of unconsidered reaction to the provocation. While some measure of thought is required to form either an intent to kill or a conscious disregard for human life, a person who acts without reflection in response to adequate provocation does not act with malice."  (*People v. Beltran* (2013) 56 Cal.4th 935, 942 (*Beltran*).)  The factor that "'distinguishes the "heat of passion" form of voluntary manslaughter from murder is provocation.'"  (*People v. Manriquez* (2005) 37 Cal.4th 547, 583 (*Manriquez*).)

10

Heat of passion "'has both an objective and a subjective component.'" (*Manriquez*, *supra*, 37 Cal.4th at p. 584.)  "The defendant must actually, subjectively, kill under the heat of passion."  (*Ibid.*)  "The provocation which incites the defendant to homicidal conduct in the heat of passion must be caused by the victim [citation], or be conduct reasonably believed by the defendant to have been engaged in by the victim."  (*Id.* at p. 583.)  The circumstances that gave rise "to the heat of passion are also viewed objectively."  (*Id.* at p. 584.)  To be objectively sufficient, "the provocation must be one that would cause an emotion so intense that an ordinary person would simply react, without reflection."  (*Beltran*, *supra*, 56 Cal.4th at p. 949.)  "The proper focus is placed on the defendant's state of mind, not on his [or her] particular act."  (*Ibid.*)  In other words, "provocation is not evaluated by whether the average person would *act* in a certain way:  to kill.  Instead, the question is whether the average person would *react* in a certain way:  with his [or her] reason and judgment obscured."  (*Ibid.*)

It is improper for a prosecutor to misstate the law.  (*People v. Centeno* (2014) 60 Cal.4th 659, 666 (*Centeno*).)  A defendant "'whose counsel did not object at trial to alleged prosecutorial misconduct can argue on appeal that counsel's inaction violated the defendant's constitutional right to the effective assistance of counsel.'"  (*Id.* at p. 674.)  "To establish ineffective assistance of counsel, a defendant must show that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and counsel's deficient performance was prejudicial, that is, there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the defendant."  (*People v. Sepulveda* (2020) 47 Cal.App.5th 291, 301

11

(*Sepulveda*); *Strickland v. Washington* (1984) 466 U.S. 668, 687-692.) "'Unless a defendant establishes the contrary, we shall presume that "counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy."'" (*Centeno*, at pp. 674-675.)

A defendant asserting ineffective assistance of counsel on direct appeal bears a "'difficult'" burden because "a reviewing court will reverse a conviction based on ineffective assistance of counsel on direct appeal only if there is affirmative evidence that counsel had 'no rational tactical purpose' for an action or omission." (*People v. Mickel* (2016) 2 Cal.5th 181, 198.) "When the record on direct appeal sheds no light on why counsel failed to act in the manner challenged, [the] defendant must show that there was "'no conceivable tactical purpose'"' for counsel's act or omission." (*Centeno*, *supra*, 60 Cal.4th at p. 675; *People v. Caro* (2019) 7 Cal.5th 463, 488.) The decision that faces defense counsel "'in the midst of trial over whether to object to comments made by the prosecutor in closing argument is a highly tactical one' [citation], and 'a mere failure to object to evidence or argument seldom establishes counsel's incompetence' [citation]." (*Centeno*, at p. 675.) "Nonetheless, deference to counsel's performance is not the same as abdication." (*Ibid.*)

Espinoza contends that the prosecutor misstated the law on provocation in the following ways: (1) stating twice that Espinoza was legally provoked only if a person of average disposition in Espinoza's position "would have reacted the same [way] he did"; (2) telling the jury that a person of average disposition "would not have killed someone"

12

and "would not have killed the new boyfriend"; and (3) asking during rebuttal, "are we just going to go around saying it's okay to kill a person that your ex is sleeping with," followed by the remark "that this is not what an average person, a person of average disposition would do. *We do not go around having known that our ex-girlfriend or ex-boyfriend is seeing someone new, and we just go and kill that person.* We do not decide to do that." (Italics added.)

The statements directing the jury to evaluate how the average person would react did not misstate the law on provocation, which focuses on "whether the average person would *react* in a certain way: with his [or her] reason and judgment obscured." (*Beltran*, *supra*, 56 Cal.4th at p. 949.) The remaining challenged statements misstated the law by directing the jury to consider whether an average person would have been provoked under the circumstances to *act* as Espinoza did—that is, *by killing* Ruiz. (*Ibid.* ["provocation is not evaluated by whether the average person would *act* in a certain way: to kill"]; see also *People v. Forrest* (2017) 7 Cal.App.5th 1074, 1085 (*Forrest*) [prosecutor misstated the law on provocation by telling the jury that provocation is sufficient "only if 'a reasonable person would have done' what [the] appellant did, that is, shoot his wife in the head"]; *People v. Najera* (2006) 138 Cal.App.4th 212, 223 (*Najera*) [prosecutor misstated the law on provocation by telling the jury that "[a]ny reasonable, ordinary person walking in on a child being molested, if they had a gun in their hand, would probably do the same thing" (italics omitted)].)

In *Beltran*, our Supreme Court expressly rejected the People's argument that adequate provocation for voluntary manslaughter "must be of a kind that would cause an

13

ordinary person of average disposition *to kill*." (*Beltran*, *supra*, 56 Cal.4th at p. 938.)

*Beltran* explained that "a standard requiring such provocation that the ordinary person of average disposition would be moved to *kill* focuses on the wrong thing." (*Id.* at p. 949.) The proper focus is instead "placed on the defendant's state of mind, not on his [or her] particular act." (*Ibid.*) In other words, the proper "focus is on the provocation—the surrounding circumstances—and whether it was sufficient to cause a reasonable person to act rashly. How the killer responded to the provocation and the reasonableness of the response is not relevant to sudden quarrel or heat of passion." (*Najera*, *supra*, 138 Cal.App.4th at p. 223.) The misstatements made by the prosecutor were directly contrary to *Beltran*. She wrongly focused on whether a person of average disposition would kill under the same circumstances. We therefore agree with Espinoza that the prosecutor misstated the law on provocation.

We next must consider whether there was any conceivable tactical reason for Espinoza's counsel's failure to object to the misstatements. (*Centeno*, *supra*, 60 Cal.4th at p. 675.) We conclude that there was none. "A prosecutor's misstatements of law are generally curable by an admonition from the court." (*Ibid.*) Regardless of the fact that the prosecutor's repeated misstatements were interspersed with correct statements of the law, the effect of the misstatements was to create possible confusion. (*Najera*, *supra*, 138 Cal.App.4th at p. 224.) Had defense counsel objected, the "court immediately could have corrected misleading or inaccurate statements of the law and could have warned the prosecutor not to repeat them." (*Ibid.*) Moreover, because one of the prosecutor's misstatements was made during rebuttal, "defense counsel had no opportunity to counter

14

it with argument of his own. His only hope of correcting the misimpression was through a timely objection and admonition from the court." (*Centeno*, *supra*, 60 Cal.4th at p. 676.) "Under these circumstances, we can conceive of no reasonable tactical purpose for defense counsel's omission." (*Ibid.*) Counsel's performance therefore fell below an objective standard of reasonableness.

But defense counsel's conduct still did not violate Espinoza's constitutional right to effective assistance of counsel unless "counsel's deficient performance was prejudicial, that is, there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the defendant." (*Sepulveda*, *supra*, 47 Cal.App.5th at p. 301.) We conclude that Espinoza has failed to carry his burden of showing prejudice.

The trial court properly instructed the jury that it was required to follow the court's instructions and not the attorneys' comments about the law. (See CALCRIM No. 200.) Moreover, the court correctly instructed the jury that for a killing to be reduced from murder to voluntary manslaughter because Espinoza killed Ruiz in the heat of passion, the jury had to find that "[t]he provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment." (See CALCRIM No. 570.) We presume that the jury followed those instructions. (*People v. Nadey* (2024) 16 Cal.5th 102, 152 (*Nadey*); *People v. Sanchez* (2001) 26 Cal.4th 834, 852.)

It is conceivable that the prosecutor's repeated misstatements of the law on the objective element of provocation created confusion, particularly given that the only

15

question that the jury asked during deliberations was about the very element on which the prosecutor misspoke. (*Najera*, *supra*, 138 Cal.App.4th at p. 224.) The jury's question nevertheless demonstrates that it was following the court's admonition and properly focused on the court's instruction. The jury specifically asked for clarification of "Basically item 3 as to 'a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment.'" "[I]tem 3" refers to the third element of heat of passion in the voluntary manslaughter instruction, and the question quotes directly from that instruction. (See CALCRIM No. 570.) Thus, the jury's question reveals that, in deciding whether Espinoza acted as a result of heat of passion so as to reduce the murder conviction to voluntary manslaughter, the jury was correctly focusing on the language of the instruction given by the court.

In addition, the evidence was insufficient to support a finding of provocation and reduce the crime to voluntary manslaughter. After learning from someone other than Ruiz that Ruiz was parked at Samantha's property, Espinoza became angry and sped over to Samantha's trailer with a gun. There was conflicting evidence about whether Espinoza and Samantha's romantic relationship had ended before that night. But regardless of their relationship status, Espinoza had learned that Samantha was romantically involved with Ruiz at least one week earlier, when Espinoza confronted Ruiz about it. There is no evidence that Ruiz had any contact with Espinoza after that encounter. Moreover, there is no evidence about what happened in the trailer after Espinoza stormed in and before Espinoza fired the first shot. There accordingly is no evidence that Ruiz did anything to provoke Espinoza. (*Manriquez*, *supra*, 37 Cal.4th at p. 583.) There is consequently no

16

nonspeculative basis on which the jury could have found that Ruiz's conduct constituted sufficient provocation to mitigate Espinoza's killing of Ruiz to voluntary manslaughter.[2]

For all of the foregoing reasons, we conclude that it is not reasonably probable that Espinoza would have obtained a more favorable result were it not for counsel's deficient performance. (See *Forrest*, *supra*, 7 Cal.App.5th at p. 1085 [prosecutor's misstatements of legal standard concerning provocation were harmless].)

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MENETREZ
J.

We concur:

RAMIREZ
P. J.

CODRINGTON
J.

---

[2]     Our conclusion that the evidence was insufficient to support a provocation finding is consistent with the second degree murder conviction. Even though the court instructed the jury on both first degree and second degree murder, it also instructed the jury that "[i]f you find the defendant guilty of murder, *it is murder of the second-degree*." (Italics added.) The jury was thus instructed that it had no choice but to find Espinoza guilty of second degree murder if it found that Espinoza murdered Ruiz. We presume that the jury followed that erroneously given instruction. (*Nadey*, *supra*, 16 Cal.5th at p. 152.)