Filed 6/6/25  P. v. Boston CA5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>TERRANCE LEVERT BOSTON,<br><br>    Defendant and Appellant. | F087744<br><br>(Super. Ct. No. F18903020)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  F. Brian Alvarez, Judge.

Sylvia W. Beckham, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Julie A. Hokans and Jeffrey A. White, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendant Terrance Levert Boston was convicted by a jury of second degree murder for the shooting death of Brittney Taylor.  At trial, the prosecution was seeking a conviction of first degree murder, while Boston was expressly seeking a conviction of

voluntary manslaughter.  On appeal, he argues the prosecutor committed misconduct during closing argument by, among other things, misstating the law on voluntary manslaughter.  We conclude the prosecutor committed misconduct but that the error was harmless.  We therefore affirm.

## STATEMENT OF THE CASE

Boston was charged in an information with one count of murder (Pen. Code,[1] § 187), with the further allegation that he personally discharged a firearm resulting in great bodily injury or death (§ 12022.53, subd. (d)).  The information further alleged Boston had suffered a prior serious felony conviction (§ 667, subd. (a)(1)), which was a prior strike offense under the Three Strikes law (§§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d)).

A jury convicted Boston of second degree murder and found true the firearm enhancement allegation.  The trial court found true the prior serious felony and prior strike enhancement allegations in a bifurcated proceeding.  The trial court sentenced Boston to 60 years to life, composed of 15 years to life for murder, doubled to 30 years to life for the prior strike, 25 years to life for the firearm enhancement, and 5 years for the prior serious felony conviction.

## FACTS

The crime occurred on May 6, 2018, and the trial took place in December 2023 through January 2024.

### I.  Background and relationship

In 2018, Boston and Taylor were romantically involved.  Boston, a truck driver who sometimes lived in his big rig, had prior convictions for corporal injury to an intimate partner (2014) and making criminal threats (2015).  His foster mother testified that he struggled with anger management while she was fostering him.

---

[1] Undesignated statutory references are to the Penal Code.

Boston and Taylor reconnected on Facebook in 2018, having known each other in high school. Boston described their relationship as non-exclusive and said he never felt jealous.

At one point, Taylor believed she might be pregnant. While Boston initially welcomed the idea of a child, he later expressed concern that he and Taylor might be related and insisted on an abortion. Texts from April 3[2] show him threatening Taylor, writing, "I will kill you and that baby and any fucking body." She later told him a pregnancy test showed she was not pregnant.

Their text messages generally revealed both affectionate and contentious exchanges between them. Boston claimed Taylor was building him an AR-15 for his birthday, and Taylor's phone records showed searches for "build your own AR-15" on April 15.

Testimony from Taylor's best friend, H.P. (a woman), and brother, G.T., provided further insight into the relationship. H.P. and G.T. were in a cohabitating relationship. On April 18, Taylor introduced Boston to G.T. Boston showed G.T. a gun, and G.T. told him to put it away, which Boston did. Later that evening, Boston, Taylor, H.P., and G.T. went to a restaurant and then a casino. G.T. felt Boston was tense and controlling, noting that Boston spoke very little to the group. H.P. observed Boston's interaction as "off" and Taylor as quieter than usual. G.T. believed Boston lost money gambling and argued with Taylor when she declined to give him more. Upset, Boston said he wanted to go out to the car and asked H.P. for her keys, as they had traveled in H.P.'s car. H.P. did not want to give him her keys, so the group left to go home. The group dropped Boston off at an apartment where he was staying, but H.P. and G.T. did not allow Taylor to go with Boston. H.P. and G.T. were uncomfortable leaving Taylor with Boston based on what

---

[2] All subsequent references to dates are to the year 2018.

they had observed that evening. G.T. felt Boston was controlling, and H.P. thought Boston was jealous.

H.P. and G.T. also observed Taylor frequently on the phone with Boston during family gatherings. H.P. said that Taylor was usually loud and vivacious but was subdued when on the phone with Boston. H.P. did not believe the relationship was healthy. She found Boston rude and offensive around Taylor's family, causing Taylor to "tense up." To H.P., Boston appeared in control of the relationship.

Taylor's text messages to others expressed aggressive sentiments on her part. On February 1, she texted someone about running "Bri dude over," followed by "fuck that dude I'm gonna run him over." On February 8, she texted in her regular group chat about Boston calling her a "bitch" and about wanting to "beat that ass" of another female. She added, "Fuck that nigga punk ass bitch" and "That's why I'm practicing at the range punk ass bitch." She added, "Fuck yeah and my shot getting better and better since punk ass people wanna waste people's time and shit." On April 27, Taylor texted the group that her cousin's house had just been "shot up" and that "they wan[t] [her] to come." She said, "We need to kill that mother fucker," adding, "I thought I was done with the lifestyle but this bitch ass nigga needs to die."

## II. Events leading to the homicide (May 5–6)

Boston and Taylor exchanged numerous telephone calls on May 1, 2, and 3. On May 4, Taylor's phone made numerous calls to Boston's phone of mere seconds in duration, but his phone did not call her phone. There were no calls on May 5 or 6. On May 5, Taylor texted H.P., "He pulled his gun out on me and I cut him off." H.P. immediately called Taylor upon receiving this message, and Taylor was "very upset" and "couldn't believe" that Boston had done that. Taylor clarified on the call that "cut him off" meant that she was not talking to or seeing Boston anymore.

In the morning on Saturday, May 5, Taylor and her mother met H.P. and G.T. for breakfast. Taylor, her mother, and H.P. then spent the day shopping. H.P. testified that

4.

Taylor was her "normal laughing loud self" that day and was not on the phone with Boston at all. Taylor later met H.P. and G.T. for dinner and drinks that night. Taylor spent the night at H.P. and G.T.'s home. Before she went to bed she said was going to wake up and go wash her car, which H.P. and G.T. thought was funny since it was so out of character for her. But when G.T. woke up at about six a.m., Taylor was gone.

During the evening on May 5, Taylor called D.C., her ex-boyfriend who was still a friend, and told him Boston had hit her. They made plans for her to pick him up in Sacramento early the next morning to drive him back to Fresno, but he never heard from her again after the call. D.C. testified that Taylor had helped him build an AR-15 and had been to the shooting range with him.

Boston testified he had lost his phone on May 4. He spent May 4–5 with his cousin, M.J., who confirmed that Boston did not have his phone and did not appear angry. M.J. dropped Boston off at a truck yard on May 5, where Boston said he slept in his rig.

On Sunday, May 6, Boston testified he began looking for Taylor to retrieve his firearm from her car so he would have it for his long-haul trucking job. He explained that he took his gun with him on trucking jobs to protect himself and his load. He stated that he had gone to a casino with Taylor and her mother and left his gun in Taylor's car because he did not want to take it into the casino. He stated that he "kind of forgot about it" in her car. The morning of May 6, he said he woke up about 3:00 and first went looking for Taylor at her mother's home. He knocked on her mother's door, but no one answered. He then went to G.T.'s home, where he saw Taylor's car in the yard.[3]

---

[3] He was not asked at trial whether he knocked on the door, and did not offer any testimony about whether he did.

## III.   The shooting

Around 6:40 a.m., V.G. saw a man—described as "a big guy"[4]—leaning into the passenger side of a car at the intersection of Cornelia and Olive.  A large white cab-over big rig was parked nearby.  After passing, V.G. heard what he believed were gunshots, then saw the car speed off, followed by the big rig.  Another witness, J.P., heard gunshots, then a car crash.  He saw the car had hit a tree and the big rig leaving the scene.

Boston testified that he happened upon Taylor at the intersection by coincidence.  He claimed she got out of her car and flagged him down.  Boston stopped his truck on the dirt shoulder next to her car.  He claimed Taylor was "very agitated" because he had not been answering her calls or responding to her messages, and she called him a "fat bitch."  When he asked for his gun, he claimed she became upset about him leaving it in her car.  He retrieved it from under the passenger seat and was checking it when she slapped him on the left side of his face, which stung.  He claimed he "blacked out" and went into a "rage," and when he "came to" he "was clicking on [his] gun."  He claimed Taylor said "wow" before putting her car in drive and driving into a nearby tree.  Boston denied having any plan to kill Taylor and claimed he blacked out before firing his gun.

Deputy Dalton Reynolds arrived at the crash scene and found Taylor deceased in her car with a gunshot wound behind her right ear.  Deputies recovered eight spent .40-caliber casings at the intersection, roughly 50–80 yards from the car.

An autopsy performed the next day found eight entry wounds, two graze wounds, and blunt trauma.  Three of the gunshots were near the right ear and one was above the right temple.  Others struck her arm and torso.  Based on stippling, the medical examiner estimated the shots were fired from three to four feet away.

---

[4] Boston testified he was 6'5" and in 2018 weighed over 300 pounds.

## IV. Aftermath and Boston's statements

Boston was identified as a suspect and surveillance was initiated. On May 7, officers arrested Boston while he was riding in a cab. A search turned up .40-caliber ammunition in the cab, along with Boston's sandals, which matched shoe prints found at the scene. His big rig contained two phones, gun-cleaning materials, and a holster.

Detectives interviewed Boston on May 7. During this initial interview, Boston denied any involvement in the shooting and claimed he wanted to clear his name. He told detectives the last he had communicated with Taylor was when he texted her on May 4 before losing his phone. He said he spent May 4 and 5 with his cousin, M.J., and spent the night at M.J.'s home on the nights of the 4th and 5th. He denied driving the white big rig on the day of the shooting. He also initially denied the ammunition in the cab belonged to him and denied owning guns. But when shown a photograph of the ammunition box found in the taxi, he identified it as .40-caliber, despite the caliber not being visible on the box in the photo. He also told detectives, "No murder weapon. You ain't got nothing against me."

Later on May 7, Boston confessed to the shooting to the detectives. He stated, "All bullshit to the side I did it." He said he initially lied to "cover [his] ass." He acknowledged his actions were unacceptable but refused to tell officers where the gun was. Boston claimed Taylor was upset he was not answering his phone and was telling him she would get her brother to come after him. Boston said he shot eight times, "[o]ne in the head, seven in the clip." He said he had "snapped" and "lost his motherfucking cool" because of "how [Taylor] was coming at [him] and shit." He stated it was "[j]ust a sad fucking mistake that [he]" made, and he acknowledged he could have driven away but "that ain't happen like that." He said the incident was, "Just one of them moments man when shit happens. You just don't really think it through you get what I'm saying…. I mean the shit just come out." He added that he apologizes to Taylor's family and said, "My actions for doing it is unknown. I loved that woman. I loved her, you

7.

know.  It's just a funny way of showing love I guess."  He also told the officer to not feel sorry for him.

During his confession to detectives, Boston did not mention Taylor slapping him or that he had left his gun in her car.  At trial, he said those details "slipped [his] mind, at the time."  He also admitted at trial that at the time of his confession, he recalled shooting precisely eight times despite his claim at trial of having "blacked out."  Asked about this inconsistency, he said, "It been so long, I can't recall everything."  He also testified that his memory of the incident was better back then.  The prosecutor also confronted him about not telling detectives that he was looking for Taylor that morning so he could get his gun.  The prosecutor asked Boston why he did not tell the detectives that, and he replied, "I don't know, I can't give you an answer for that."  The prosecutor asked, " 'Cause it wasn't true?"  Boston said, "Can't say that."  He testified he panicked after the shooting, drove back to the truck yard, and later disposed of the weapon at a truck stop in Madera.  He tried to avoid police.

During his jail booking on May 7, Boston asked the identification technician who was fingerprinting him his charges.  The technician told Boston his charges, and Boston appeared disconnected and said he did not know how he got to this place and how things got to where they are.  The technician told him he should speak to a lawyer, and Boston stated, "It doesn't matter.  I already confessed.  I did it."  Boston then commented that the police did not have the murder weapon but again acknowledged that he had "confessed." He later said he needed to "talk to Psych."

## V.    Rebuttal evidence

Retired police officer Michael Agnew testified as an expert in domestic violence. Agnew discussed the role of threats and "power and control" in domestic violence, explaining it is "the basis behind the majority of our domestic violence cases where one person tries to maintain the power over the other person[.]"  He discussed the "cycle of violence" and opined that the most dangerous time for a victim is when they leave the

relationship, as the abuser feels loss of control. Agnew had not been told the facts of this case.

H.P. also testified in the People's rebuttal. She explained that Taylor and Boston were in an off-and-on relationship for a few months, and Taylor was often on the phone with Boston when with H.P. She recalled advising Taylor to end the relationship with Boston after he pulled his gun on her, which Taylor agreed to. But H.P. did not know if Taylor actually did. H.P. never saw Taylor get in Boston's face. During the casino interaction, H.P. believed Boston was hostile and Taylor was trying to defuse the situation.

D.C.[5] testified that he had met Taylor through H.P. and they had been intimate. Taylor had lived with D.C. from about 2015 to 2017, and they maintained a strong friendship. The night before Taylor was killed, she called D.C. and told him Boston had "hit her."

## DISCUSSION

Boston contends the prosecutor committed misconduct during closing argument in three different ways. We agree the prosecutor committed misconduct in one of these ways but conclude it was harmless.

## I.     Additional facts

Before closing arguments, the trial court instructed the jury on first degree murder, second degree murder, and heat of passion voluntary manslaughter using CALCRIM pattern instructions. The jury was also instructed that provocation may reduce a murder from first degree to second degree and may reduce murder to manslaughter. The trial court also instructed the jury that they were to follow the law as the court explained it, even if they believed an attorney's comments conflicted with the court's instructions.

---

[5] D.C. testified only in the prosecution's rebuttal case.

9.

During closing argument, the prosecutor accurately quoted from the pattern instruction on voluntary manslaughter regarding the required mental state for heat of passion. The prosecutor said in part, "In deciding whether the provocation was sufficient, consider whether a person of average disposition, in the same situation and knowing the same facts, would have reacted from passion rather than from judgment." But the prosecutor continued:

> "So, Ladies and Gentlemen, you're not—even if you believe what the defendant is trying to sell you when he testified, you're at second degree. Because when somebody is called a fat ass, or somebody slaps another person, is that—is that how someone would react? How a reasonable person, an average person in that situation, would they pull out a gun and … shoot a person in the face?"

Defense counsel interrupted to object that the prosecutor had misstated the law. The trial court overruled the objection and advised the jury, "[T]o the extent that any argument conflicts with the Court's instructions in law, please recall it's the Court's instructions that control."

The prosecutor continued: "Okay. That's not what the average person in that situation would do. So, again, I'm not telling you to believe any of these lies. But even if you do, you're at second-degree." The prosecution then explained why the killing was first degree murder.

Later, the prosecution told the jury that an example of voluntary manslaughter "is when somebody walks in and they've been married for 25 years, and they walk in—" whereupon defense counsel interrupted to object that the prosecutor's argument "confuses the issue." The trial court overruled the objection and told the jury, "[T]o the extent that you have any question with regards to the argument in the law, once again, it's the Court's instruction in the law that controls, not the attorneys' arguments. It's overruled."

The prosecutor continued: "Married 25 years, you walk into the bedroom and see your wife or your husband in the bed with your best friend. And you're so consumed and

you're so upset and your blood is boiling that you act in the heat of passion.  It's not when somebody calls you a name, or when somebody slaps you.  So, again, we're back at second-degree."

The prosecutor also argued that Boston was lying about leaving his gun in Taylor's car and about Taylor slapping him in the face.  She emphasized that he omitted these details from his confession to detectives, and also emphasized how Boston precisely recalled during his confession shooting Taylor eight times but at trial claimed he had "blacked out" during the shooting.

Defense counsel during closing argument sought to correct what he perceived to be the prosecution's misstatement of the law regarding heat of passion.  He said, "It doesn't require or say that a person of average disposition would kill…. It's only whether or not a person themselves, a reasonable person would respond with rash behavior."  Defense counsel also expanded on the definition of heat of passion in the CALCRIM voluntary manslaughter instructions:

> "And see, this third element, the provocation would have caused a person of average disposition to act rashly and without the deliberation, that is from passion, rather than from judgment.  That doesn't say that an average person would kill.  It says that they would act rashly without thinking about it, without deliberating, without using their judgment.  And so it is not a matter of whether or not the average person would be driven to kill from this provocation, it's whether or not an average person would respond from emotion instead of judgment and deliberation."

Defense counsel said later during closing argument:

> "I imagine when the D.A. gives her rebuttal, she's likely going to say that this wasn't sufficient provocation.  Well, it's—it's not sufficient provocation to kill and that's why it's a crime.  But is it sufficient provocation to produce an emotional reaction?  Being hysterical, being yelled at about losing your phone, and then being slapped in the face.  These would produce emotional reactions in the average—in the person of average disposition."

In rebuttal, the prosecutor urged the jury to discredit Boston's testimony since he was a convicted felon, was a domestic violence perpetrator, had lied to the detectives, and his testimony was self-serving. The prosecutor also said:

> "Defense is saying my argument is it's not sufficient provocation that when she slapped him that he shot her. I just want to make it really clear, that is not my argument. Because my argument is that she never slapped him, that it's all BS, that it's a lie."

She argued that, if Taylor had slapped Boston, he would have included that detail when he confessed on the day of his arrest; the prosecutor urged the jury convict Boston of first degree murder.

## II.     Issues and analysis

Boston asserts the prosecutor committed misconduct during her closing argument in three different ways. First, he claims the prosecutor misstated the law on voluntary manslaughter by telling the jury the standard for heat of passion is whether a reasonable person in Boston's situation would have been provoked to kill. Second, he argues the prosecutor improperly argued that being slapped in the face and called a name is inadequate as a matter of law to constitute provocation for voluntary manslaughter. Third, he claims the prosecutor improperly told the jurors that if they believed Boston's testimony, it proved he was guilty of second degree murder. The second and third claims appear to involve the same core contention, and thus we will address them together. We agree with Boston's first claim that the prosecutor misstated the law on provocation. But we disagree that the prosecutor erred in the other ways claimed. We also conclude the sole instance of misconduct was harmless.

### A.     Background law

"Murder is the unlawful killing of a human being ... with malice aforethought." (§ 187, subd. (a).) Malice may be express or implied. Malice is express when the defendant intends to kill the victim. (§ 188, subd. (a)(1); *People v. Saille* (1991) 54 Cal.3d 1103, 1114–1115.) Implied malice has " ' "both a physical and a mental

component.  The physical component is satisfied by the performance of 'an act, the natural consequences of which are dangerous to life.'  [Citation.]  The mental component is the requirement that the defendant 'knows that his conduct endangers the life of another and … acts with conscious disregard for life.' " ' " (*People v. Soto* (2018) 4 Cal.5th 968, 974 (*Soto*).)

"All murder that is perpetrated by … [a] willful, deliberate, and premeditated killing … is murder of the first degree." (§ 189, subd. (a).)  "All other kinds of murder are of the second degree." (§ 189, subd. (b).)

"Voluntary '[m]anslaughter, a lesser included offense of murder, is an unlawful killing without malice….  Two factors may preclude the formation of malice and reduce murder to voluntary manslaughter:  heat of passion and unreasonable self-defense.' " (*Soto, supra,* 4 Cal.5th at p. 974.)

"A heat of passion theory of manslaughter has both an objective and a subjective component." (*People v. Moye* (2009) 47 Cal.4th 537, 549.)  The provocation must, from an objective standpoint, be such as would "render an ordinary person of average disposition 'liable to act rashly or without due deliberation and reflection, and from this passion rather than from judgment.' " (*People v. Beltran* (2013) 56 Cal.4th 935, 950, 957 (*Beltran*).)  In other words, the test is whether "an average, sober person would be so inflamed that he or she would lose reason and judgment." (*People v. Lee* (1999) 20 Cal.4th 47, 60.)  The test is *not* "whether the person would *act* in a certain way:  to kill.  Instead, the question is whether the average person would *react* in a certain way: with his reason and judgment obscured." (*Beltran*, at p. 949.)  Additionally, "the victim must taunt the defendant or otherwise initiate the provocation." (*People v. Carasi* (2008) 44 Cal.4th 1263, 1306.)

As to the subjective component, the defendant must have actually acted in the heat of passion. (*People v. Steele* (2002) 27 Cal.4th 1230, 1252.)  " '[I]f sufficient time has elapsed between the provocation and the fatal blow for passion to subside and reason to

return, the killing is not voluntary manslaughter—"the assailant must act under the smart of that sudden quarrel or heat of passion." [Citation.]' [Citations.] Thus, it is insufficient that one is provoked and later kills. If sufficient time has elapsed for one's passions to 'cool off' and for judgment to be restored, [the provocation] provides no mitigation for a subsequent killing." (*Beltran, supra,* 56 Cal.4th at p. 951.)

### B. Analysis

The prosecutor here misstated the law by essentially arguing that the proper standard for assessing the adequacy of provocation is whether an ordinary person of average disposition would be moved to kill. Indeed, the prosecutor went so far as to tell the jury, not only would an ordinary person be moved to kill but would have shot the victim in the face. The prosecutor thus committed misconduct. (*People v. Boyette* (2002) 29 Cal.4th 381, 435 ["[I]t is misconduct for the prosecutor to misstate the applicable law[.]"].)

That said, we disagree with Boston that the prosecutor erred in the other claimed ways. He complains that the prosecutor used the analogy of catching your spouse in bed as part of her improper argument that being slapped in the face and called a name is inadequate as a matter of law to constitute adequate provocation for involuntary manslaughter. But we do not perceive the prosecutor as having argued that being slapped and called a name was inadequate evidence as a matter of law. Rather, analyzing her argument in context, the prosecutor was arguing, as she was entitled to do, that the specific provocation that Boston described in his testimony was insufficient to cause a person of average disposition to act rashly, and she used an oft-cited analogy as a comparison.

As to his third claim, Boston complains that the prosecutor's remarks were similar to the argument held improper in *People v. Najera* (2006) 138 Cal.App.4th 212 (*Najera*). There, the prosecutor argued:

"I submit this case is a first degree murder. Let me show you some facts to show you an analogy where it wouldn't be a first degree, it would be a second in this case. Had the defendant and the victim gotten into the initial fist fight and the defendant pulled out a knife and stabbed him right away, see the difference? That arguably would be a murder in the second degree. Why? Because during the first fist fight he yanks out the knife and stabs him. Heat of passion, sudden quarrel." (*Najera, supra,* 138 Cal.App.4th at p. 221.)

The reviewing court held this argument was error for suggesting sudden quarrel or heat of passion could be a basis for convicting the defendant of second degree murder. (*Najera, supra,* 138 Cal.App.4th at p. 221.) Boston argues the prosecutor's arguments here were likewise improper. He cites the prosecutor's comment, "[E]ven if you believe what the defendant is trying to sell you when he testified, you're at second degree." Also, "I'm not telling you to believe any of these lies. But even if you do, you're at second degree." And, "It's not when somebody calls you a name, or when somebody slaps you. So, again, we're back at second degree." But the prosecutor here did not suggest that Boston's testimony established heat of passion or sudden quarrel and *therefore* he is guilty of second degree murder, which was the nature of the error in *Najera*. Instead, the prosecutor argued that Boston's testimony did *not* establish heat of passion or sudden quarrel and therefore he was guilty of murder. *Najera* is thus distinguishable.

We next must determine whether reversal is warranted, and precedent from the California Supreme Court provides the framework. "In evaluating whether prosecutorial error is prejudicial, the standard for prejudice depends on whether the error violates the federal Constitution or the California Constitution; if it is the former, the error mandates reversal unless it is ' " 'harmless beyond a reasonable doubt' " '; if it is the latter, the error mandates reversal 'if there [is] a "reasonable likelihood of a more favorable verdict in the absence of the challenged conduct." ' [Citations.] In evaluating the degree of prejudice from a prosecutor's misstatements of the law under either standard, courts look to (1) whether the misstatements were fleeting or more pervasive [citations]; (2) whether

15.

the evidence of the defendant's guilt on the issue affected by the misstatement was close or overwhelming [citations]; (3) whether other jury instructions obviated the effect of the error [citations]; and (4) whether the jury made other findings that necessarily indicate that the error had no effect [citation]." (*People v. Collins* (2021) 65 Cal.App.5th 333, 342.) Under either standard, the misconduct here was harmless.

Boston claims the trial court's instructions before closing arguments and its repeated admonition to jurors after defense counsel's objections to follow the court's instructions did not cure the misconduct. He also argues that the court's overruling his counsel's objections to the prosecutor's misstatements of the law "gave the appearance of condoning" those misstatements. The People urge us to presume the jurors followed the trial court's correct pre-argument instructions and ignored any misstatements. (See *People v. McDermott* (2002) 28 Cal.4th 946, 999.) They also argue that the court did not give the appearance of condoning the "prosecutor's interpretation of the standards" since it directed the jury back to the instructions containing the correct standard.

We conclude the error was harmless beyond a reasonable doubt because of the serious credibility issues as to Boston's testimony regarding the provocation. The theory he offered at trial—that Taylor slapped him in the face and insulted his weight, causing him to "black out" in a "rage"—is not insufficient as a matter of law to constitute provocation for a manslaughter conviction.

However, the problem lies not with the nature of the provocation, but with the credibility of Boston's account. Boston made no mention of any slap or insult in his confession to police, in which he explained he shot Taylor because he "lost his motherfucking cool" because of "how she was coming at [him] and shit" and recounted shooting Taylor exactly eight times. His explanation at trial for omitting the slap and insult—that they simply "slipped his mind"—strains credulity, especially given that these details form the crux of his defense at trial. Also, his trial claim that he blacked out is irreconcilable with his confession to detectives, made the day after the shooting, that he

shot her eight times. In light of the significant credibility concerns surrounding his provocation claim, we find it entirely unlikely the jury would have returned a different verdict but for the prosecutor's misstatements of the law. We recognize Boston's argument that the jury's seven hours of deliberation and requested readback of Boston's testimony "establish that the case was a close one." But for the reasons just explained, if this were a close case for the jury, we are confident beyond a reasonable doubt that the closeness was on the question of first degree versus second degree murder, not the question of murder versus manslaughter.

Since we find the prosecutor's misconduct harmless under the more demanding "harmless beyond a reasonable doubt" standard applicable to violations of the federal Constitution, the misconduct is necessarily harmless under the more lenient standard for violations of the state Constitution.[6]

## DISPOSITION

The judgment is affirmed.

SNAUFFER, J.

WE CONCUR:

PEÑA, Acting P. J.

DE SANTOS, J.

---

[6] In light of this conclusion, we need not address the People's argument that Boston forfeited all of his claims below.

17.